STATE OF NORTH CAROLINA v. JEFFREY NEAL DUKE

No. 57A04

(Filed 16 December 2005)

**1. Evidence— prior crimes or bad acts—violent behavior— opening the door to character evidence**

The trial court did not err in a double first-degree murder case by overruling defendant's objection to the admission of specific acts of bad conduct during redirect examination of his half-sister concerning defendant's violent behavior, because: (1) whenever a defendant opens the door to character evidence by

introducing evidence of his own pertinent character trait, the prosecution may rebut that evidence with contrary character evidence; and (2) the prosecution's rebuttal of defendant's evidence of good character through the use of specific instances of conduct was proper.

**2. Criminal Law— prosecutor's argument—judge may tell jurors that defendant acted with premeditation and deliberation**

The trial court did not abuse its discretion in a double first-degree murder case by failing to intervene ex mero motu during the prosecution's closing argument stating that the judge may tell the jurors that defendant acted with premeditation, because: (1) the prosecution's statement did not directly and unambiguously tell the jury the court formed an opinion on the evidence; (2) as there was no objection, and therefore no overruling by the trial court of defendant's objection, this idea was not solidified in the jurors' minds; (3) the prosecution's argument did not travel outside the record as prohibited by N.C.G.S. § 15A-1230(a); and (4) the trial court instructed the jury the court was impartial and the jury would be mistaken to believe otherwise.

**3. Criminal Law— instruction—confession—supporting evidence—invited error**

The trial court did not err in a double first-degree murder case by its instruction to the jury on confession, because: (1) the instruction conformed to the North Carolina Pattern Jury Instruction on confession; (2) an instruction by the trial court stating the evidence tends to show the existence of a confession to the crime charged is not an impermissible comment invading the province of the jury and its fact-finding function; (3) considering defendant's admissions which tended to show premeditation and deliberation, the statement did support inclusion of the confession instruction; (4) the instruction left it to the jury to conclude whether the confession occurred and what weight to give it; and (5) defendant cannot show prejudice on this issue when it was defendant, not the prosecution, who requested this jury instruction.

**4. Sentencing— capital—prior crimes or bad acts—threat made by defendant**

The trial court did not err in a double first-degree murder case by admitting testimony during the penalty phase concerning a threat made by defendant to a witness, because: (1) it was

proper for the prosecution to attack the credibility of the witness and also to discredit the witness's contention defendant was peaceful by showing he threatened the lives of the witness, her child, and her husband after an argument concerning a funeral; (2) the prosecution simply impeached the witness with her prior inconsistent statements to a detective concerning the threats which clearly contradicted her direct testimony; (3) when a witness gives his opinion as to the character of another, the cross-examiner may test that opinion with questioning on specific acts of conduct; (4) the evidence concerning the threat, while also impeaching the witness and challenging her opinion, went directly to the heart of defendant's violent nature; and (5) the prosecution was entitled to submit evidence contrary to the assertion of defendant's proposed mitigating circumstance that defendant had a deep emotional bond with this witness.

**5. Sentencing— capital—objection to statement—defendant wants to apologize to victims' families—harmless error**

Any error by the trial court in a double first-degree murder case by sustaining the prosecution's objection to the statement by defendant's mother during the penalty proceeding that defendant wanted to apologize to the victims' families was harmless beyond a reasonable doubt, because: (1) any possible error was caused by defendant's failure to offer a proper foundation to ensure the reliability of the testimony from his mother; and (2) the jury heard other sufficient testimony of defendant's remorse during the penalty proceeding through a doctor who opined that defendant was remorseful for his actions.

**6. Sentencing— capital—failure to allow testimony—defendant would adjust well to life in prison—harmless error**

Although defendant contends the trial court erred in a double first-degree murder case by failing to allow defendant's mother to testify that defendant would adjust well to life in prison, any error was harmless beyond a reasonable doubt because three other witnesses gave testimony from which the jury could have found defendant would adjust well to prison life.

**7. Sentencing— capital—testimony—defendant's mental state— harmless error**

Although defendant contends the trial court erred in a capital sentencing proceeding by sustaining the prosecution's objection when defendant's sister testified that defendant was just caught

**STATE v. DUKE**

[360 N.C. 110 (2005)]

in a bad situation and that he did not intend for this to happen, any error was harmless beyond a reasonable doubt because: (1) defendant failed to lay a proper foundation for testimony concerning his mental state; (2) it appears from the context of the testimony that the witness was speaking of all the actions of the night and early morning of the murders, not the murders in particular, and the jury already decided in the guilt-innocence proceeding that defendant intended to commit these murders; (3) defendant did not submit for consideration a good character mitigating circumstance; and (4) defendant's mother, his son, and his childhood friend testified to facts and circumstances which tended to show defendant was a good person.

**8. Sentencing— capital—prosecutor's argument—expert witness the $15,000 man**

The trial court did not abuse its discretion in a double first-degree murder case by failing to intervene ex mero motu during the prosecution's penalty proceeding closing argument that referred to defendant's expert witness as the $15,000 man, because the statement was not grossly improper when it merely emphasized that the expert's fee in the case was $15,000 and that the jury should take that fact into account when determining the credibility of the expert and the weight it should place on his testimony.

**9. Sentencing— capital—prosecutor's argument—defendant's choice to turn back on family—crap**

The trial court did not abuse its discretion in a capital sentencing proceeding by failing to intervene ex mero motu during the prosecution's penalty proceeding closing argument that used the word crap, because the prosecution did not engage in any name-calling nor did the prosecutor improperly disparage defendant's argument, but instead the prosecutor discussed the choice defendant made to turn his back on his family and pursue instead a life of drug abuse, alcohol abuse, and violence, which culminated in a senseless and brutal double murder.

**10. Sentencing— capital—mitigating circumstances—mental or emotional disturbance—capacity to appreciate criminality of conduct or to conform conduct to requirements of law impaired**

The trial court did not err in a capital sentencing proceeding by refusing to grant defendant's request to give the jury peremptory instructions on the N.C.G.S. § 15A-2000(f)(2) mitigating cir-

cumstance that the capital felony was committed while defendant was under the influence of mental or emotional disturbance and the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, because: (1) there is nothing in the record or the transcript to indicate such a request was made in writing by defendant; and (2) even if the requested instructions had been submitted in writing the evidence supporting the (f)(2) and (f)(6) mitigating circumstances was not uncontroverted.

**11. Sentencing— capital—nonstatutory mitigating circumstances—provocation**

The trial court did not err in a capital sentencing proceeding by denying defendant's request to submit to the jury the nonstatutory mitigating circumstance that defendant's actions toward the victims were influenced to some degree by their behavior toward him and that he reacted to what he thought was provocation on the part of the victims, because a defendant is not entitled to place the question of his guilt of first-degree murder back onto the table for the jury to decide when the jury decided during the guilt-innocence proceeding that defendant was guilty of first-degree murder, thus rejecting his contention he acted under perceived provocation.

**12. Sentencing— capital—mitigating circumstances—reinstruction to the jury**

The trial court did not commit plain error in a capital sentencing proceeding by reinstructing the jury on mitigating circumstances after the jury submitted a question to the court seeking clarification, because: (1) the trial court did not instruct the jurors that the statutory mitigators were not to be found unless the jury concluded they had mitigating value; and (2) if any error occurred in the reinstruction, this error was to defendant's benefit since it implied all the listed circumstances had some mitigating value, rather than instructing the jury it should not find a nonstatutory mitigating circumstance unless it deemed that circumstance to exist and have mitigating value.

**13. Sentencing— capital—aggravating circumstance not submitted in first trial—double jeopardy**

Principles of double jeopardy did not prevent the trial court from submitting the N.C.G.S. § 15A-2000(e)(9) aggravating cir-

cumstance for the murder of one of the victims in this trial even though it was not submitted during the penalty proceeding of defendant's first trial, because: (1) the bar against double jeopardy does not prevent a sentence of death unless a jury finds no aggravating circumstance existed in a prior trial and thereby would have been required to recommend a sentence of life imprisonment without parole during the first trial, and in the instant case the jury in the first trial found an aggravating circumstance and recommended death for defendant's murder of the victim; and (2) contrary to defendant's assertion, the holding in *Ring v. Arizona*, 536 U.S. 584 (2002), does not change this result since it simply requires the jury, rather than the trial court, to find any aggravating circumstance which leads to the imposition of the death penalty.

**14. Sentencing— capital—aggravating circumstances—especially heinous, atrocious, or cruel**

Defendant's constitutional rights were not violated in a capital sentencing proceeding even though he contends the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad, because: (1) the pattern jury instruction at 1 N.C.P.I.—Crim. 150.10 is not unconstitutionally vague or overbroad with regard to the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance and our Supreme Court's appellate narrowing of the especially heinous, atrocious, or cruel aggravating circumstance has been incorporated into the pattern jury instruction; (2) contrary to defendant's assertion, our Supreme Court's conducting appellate review of a question submitted to the jury does not make it a cofinder of fact with the jury in violation of *Ring v. Arizona*, 536 U.S. 584; and (3) this argument by defendant is speculative in nature when defendant did not assert in his brief or at oral argument that the murders committed by him were not especially heinous, atrocious, or cruel or for some reason require appellate narrowing.

**15. Sentencing— capital—weighing aggravating and mitigating circumstances—Issue 3**

The trial court did not commit plain error in a capital sentencing proceeding by its submission of Issue 3 regarding the jury's determination of the weight of mitigating and aggravating circumstances, because: (1) a capital punishment scheme which requires a recommendation of death upon the finding of certain factors or circumstances does not violate the Constitution so

long as the jury is allowed to consider and give effect to all relevant mitigating evidence; (2) North Carolina's capital punishment scheme does not limit in any way the mitigating evidence the jury may consider in making its decision; and (3) our statute does not mandate death based solely upon the weighing of mitigating and aggravating circumstances.

## 16. Sentencing— death penalty—proportionate

The imposition of the death penalty was not disproportionate in a double first-degree murder case, because: (1) the jury found three aggravating circumstances for both murders including that defendant had been previously convicted of a felony involving the use of violence to the person; the murders were especially heinous, atrocious, or cruel; and the murders were part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against other persons; (2) the murders in this case were especially brutal when defendant plunged knives into the neck and chest of one victim and into the upper abdomen of the other after the victims were unconscious or dead from the violent blows of a fire extinguisher; and (3) the death sentence has never been found to be disproportionate in a double-murder case.

Justice PARKER did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing consecutive death sentences entered by Judge Timothy L. Patti on 26 September 2003 in Superior Court, Gaston County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. Heard in the Supreme Court 18 October 2005.

*Roy Cooper, Attorney General, by G. Patrick Murphy and Mary D. Winstead, Special Deputy Attorneys General, for the State.*

*Staples S. Hughes, Appellate Defender, by Benjamin Dowling-Sendor, Assistant Appellate Defender, for defendant-appellant.*

BRADY, Justice.

During the early morning hours of 20 March 1999, defendant Jeffrey Neal Duke brutally and mercilessly murdered Ralph Arthurs and Harold Grant, beating them with a fire extinguisher and stabbing both men while they were down leaving a total of four knives in the

victims' bodies. On 19 September 2003, a jury found defendant guilty of two counts of first-degree murder based on malice, premeditation, and deliberation[1], and subsequently on 26 September 2003, the jury recommended a sentence of death. We find no error in defendant's conviction or sentence.

## FACTUAL BACKGROUND

As seemed to be his custom, defendant began consuming alcoholic beverages on 19 March 1999. After drinking Jim Beam bourbon whiskey and Long Island Iced Tea, defendant argued with Michelle Lancaster, a female with whom he was living. He slapped Michelle on the head, knocking her to the ground, took her money and a bottle of prescription medication, and left the residence. He eventually ended up at the apartment of Ralph Arthurs. Ralph Arthurs, Harold Grant, and defendant sat in Arthurs's apartment while defendant and Arthurs drank alcohol. Soon, Arthurs and Grant began discussing defendant's earlier beating of Robin Williams, defendant's former girlfriend. Arthurs demanded defendant leave the apartment, and defendant asked if he could finish his beer first. Grant got up and started walking towards the sink. When Grant got close to a knife block located on the counter beside the sink, defendant claims he thought Grant was going to attack him with a knife, although defendant admits Grant could have just been getting water.

Defendant stood up, grabbed a fire extinguisher, and started beating both Grant and Arthurs. At one time Grant got up from the floor and attempted to leave the apartment. Defendant dragged him back in and continued beating him. Defendant then stabbed Arthurs in the upper abdomen, and stabbed Grant in the face, chest, and neck. Defendant left the knives in Arthurs's upper abdomen, Grant's chest, and on both sides of Grant's neck. Grant's autopsy reflected the stab wounds were likely inflicted after Grant was rendered unconscious or had died. One knife recovered from Grant's neck was bent at a ninety-degree angle, indicating the force with which defendant plunged the knife into Grant's lifeless body. The cause of death for both murders was blunt force trauma to the head. Arthurs's pants were around his knees, and Grant's pants pockets were pulled out. The autopsy reports indicate Arthurs's blood alcohol content was .04, while Grant's did not register any alcohol present in his blood.

---

1. Additionally, the jury found defendant guilty of first-degree murder of Harold Grant under the felony murder rule.

A blood spatter and stain expert testified for the State during trial and shed further light on the brutality of the killings. A blood stain which started at the front door and extended back to the body of Grant was consistent with defendant's dragging of Grant's body back into the apartment. In addition, a blood spatter on the front porch indicated Grant's head came into contact with the porch at some point. A blood spatter near Grant's head was consistent with his body being dragged back into the apartment, dropped face down onto the floor, and then later turned on his back. The blood spatter on the wall was consistent with the swinging of a fire extinguisher which hit Grant's head. In addition, the authorities found Arthurs's body with a significant amount of blood pooled to the left side of his head and a lack of blood on the front of his clothing. In the expert's opinion, Arthurs was also at one time lying face down and then subsequently rolled over.

These killings occurred the morning of 20 March 1999 around 4:00 a.m. The noise from the struggle awoke a neighbor, Macie Randall, along with her granddaughter Angel. Later that morning, Tommy Feemster, the superintendent of the apartment building where the murders took place, went to the apartment complex to repair a leaky toilet in Arthurs's apartment. Feemster's coworker motioned for him to come to the door of Arthurs's apartment. When Feemster arrived at the door, they noticed what appeared to be blood on the area outside the door. Feemster immediately went to Macie Randall's apartment, and she informed him of the struggle she heard earlier that morning. Feemster then returned to Arthurs's apartment and pushed open the door, stepped inside, and discovered a body with a knife sticking in it. Based upon what he observed, he immediately closed the door and called the police.

The evidence reflected that after leaving the crime scene, defendant smoked some crack cocaine, and later that morning started seeking help from friends and family members. He telephoned Michelle Lancaster who told him he needed to retrieve his belongings and move out of her residence because of their recent altercation. She also told defendant she would not help him. Defendant then went to an automobile dealership where his sister Charlene McKinney worked. From there, he telephoned his half-sister Lisa Sneed and told her he needed her to pick him up at a nearby restaurant. Sneed picked him up, later that day took him to Lancaster's residence to pick up his belongings, and then they returned to Sneed's residence. After arriving at Sneed's residence, defendant put a pair of jeans and

**STATE v. DUKE**

[360 N.C. 110 (2005)]

a pair of shoes in the washing machine. Later, Sneed received a telephone call from a detective investigating the homicides who was seeking to interview defendant and Sneed. When Sneed inquired of defendant concerning this request, he informed her the detective wanted to question him about a murder.

Defendant asked Sneed to lie to the detectives and tell them defendant and Sneed were together during the time of the murders. He told her he was with some guys smoking crack, and they would not cover for him. Based upon the detective's telephone call, defendant and Sneed went to the police station along with Robin Williams. Sneed told police the lie defendant posited, and Sneed and defendant quickly departed when detectives requested consent to search her residence. Upon returning to Sneed's residence, defendant grabbed his clothes and shoes from the washing machine, and Sneed gathered some drug paraphernalia she did not want the police to find. Defendant and Sneed then drove to Clover, South Carolina and threw the clothing items and drug paraphernalia out the window.

The next day defendant and Sneed went to a grocery store where defendant asked Sneed to purchase a newspaper. After reading about the murders in the newspaper, defendant revealed to Sneed he in fact killed the two men. He claimed one of the men pulled a gun on him, and then defendant told Sneed to "[t]ake it to your [expletive deleted] grave." The very next day Sneed went to the police station, told the detectives what defendant said, and told the detectives she had lied in their prior interview. Defendant was soon arrested, and shortly thereafter invoked his right to counsel. Later defendant voluntarily requested the detectives question him—at which time he admitted killing the victims. Defendant presented no evidence in the guilt-innocence proceeding. Upon deliberation, the jury found defendant guilty of two counts of first-degree murder.

During the penalty proceeding, the State presented testimony from family members of Grant and Arthurs detailing the effects of the victims' murders on their lives. The State elicited testimony from Phyllis Williams, the mother of Robin Williams, concerning an incident in which defendant beat Robin. In addition, two law enforcement officers testified regarding this event, and the State submitted into evidence a judgment reflecting a conviction against defendant arising from his assault of Williams. Defendant served time in prison and also received probation as punishment for this beating.

STATE v. DUKE

[360 N.C. 110 (2005)]

Defendant submitted evidence of a difficult home life, including his father shooting his maternal grandfather shortly after his birth. He also submitted evidence he dropped out of high school, was successful in a group home, was a good father, and came from a family that consumed copious amounts of alcohol. A vocational rehabilitation counselor testified defendant had been employed as a drywall installer. However, on cross-examination the prosecution elicited testimony defendant violated his probation while being aided by the vocational rehabilitation counselor.

Defendant's forensic psychologist James H. Hilkey, Ph.D. also testified as an expert in the penalty proceeding. In his opinion, defendant suffers from longstanding depression, bipolar disorder, poly-substance abuse problems, and exhibits some characteristics of borderline personality disorder with antisocial and paranoid features. Dr. Hilkey testified defendant had been admitted numerous times to Dorothea Dix Hospital for various mental health problems, including attempted suicide, impulse control disorder, poly-substance abuse, and paranoid personality disorder. Dr. Hilkey also opined defendant suffers from attention deficit hyperactivity disorder. Dr. Hilkey believed defendant would adjust well to prison life so long as he was compliant with his medication regimen. In addition, Dr. Hilkey testified on cross-examination his fee would be $15,000 in this case.

After the trial court's instruction on the submitted mitigating and aggravating circumstances and our statutory requirements for imposition of capital punishment, the jury commenced deliberations. The jurors found unanimously and beyond a reasonable doubt the following aggravating circumstances as to both murders: (1) defendant had been previously convicted of a felony involving the use of violence to the person; (2) the murders were especially heinous, atrocious, or cruel; and (3) the murders were part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against other persons.

No juror found any statutory mitigating circumstance, but at least one juror found eleven nonstatutory mitigating circumstances. After finding the mitigating circumstances were insufficient to outweigh the aggravating circumstances beyond a reasonable doubt, and the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstances beyond a reasonable doubt, the jury returned a binding recommendation of death.

STATE v. DUKE

[360 N.C. 110 (2005)]

## *GUILT-INNOCENCE ISSUES*

[1] Defendant claims the trial court committed reversible error when it overruled his objection to the admission of specific acts of bad conduct during redirect examination of Lisa Sneed. On cross-examination, defendant elicited testimony from Sneed that defendant could get violent after using drugs and alcohol, but when he is not consuming alcohol or drugs he has a heart of gold and is a good person. On redirect examination, the prosecution's questioning elicited more information on defendant's violent character, namely his violence against two other people.

Rule 404 of our Rules of Evidence provides in part:

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.*—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same; . . .

N.C.G.S. § 8C-1, Rule 404 (2003). Additionally, subsection (b) of Rule 404 provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Defendant asserts the admission on redirect examination of the prior bad acts violated Rule 404(b) and thus constitutes reversible error. We disagree.

Whenever a defendant "opens the door" to character evidence by introducing evidence of his own pertinent character trait—in this case his peacefulness—the prosecution may rebut that evidence with contrary character evidence. *See id.* Rule 404(a)(1). Defendant cannot complain when the whole story is revealed, part of which he elicited through his own questioning. *See* N.C.G.S. § 15A-1443(c) (2003) ("A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct."). In *State v. Syriani*, we found no error in the admission of other specific acts of conduct after the defendant himself first elicited specific acts of conduct during his questioning. 333 N.C. 350, 378-80, 428 S.E.2d 118, 132-34, *cert. denied*, 510 U.S. 948 (1993).

[T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant

himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially.

*State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981). While the bad acts elicited by the prosecution on redirect of Lisa Sneed may have been inadmissible on direct examination before defendant "opened the door" during cross-examination, the prosecution's rebuttal of defendant's evidence of good character through the use of specific instances of conduct is proper. *See State v. Garner*, 330 N.C. 273, 289-90, 410 S.E.2d 861, 870 (1991). Therefore, we overrule defendant's assignment of error.

[2] Defendant also assigns as error the failure of the trial court to intervene *ex mero motu* in the prosecution's closing argument. Defendant takes exception to the following statement by the prosecutor: "The judge may tell you that the defendant acted with deliberation. Excuse me, with pre—the defendant acted with premeditation, that is, he formed the intent to kill the victim over some period of time." Defendant did not object, so we review this statement to see whether it was so grossly improper the trial court abused its discretion in failing to intervene *ex mero motu. See State v. Gregory*, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995), *cert. denied*, 517 U.S. 1108 (1996). We hold this statement was not so grossly improper as to require intervention by the trial court.

Defendant's argument rests heavily on our decision in *State v. Allen*, 353 N.C. 504, 546 S.E.2d 372 (2001). In that case, we held there was an improper argument during closing statements when the prosecutor told the jury the trial judge found a statement reliable and trustworthy, and if the trial judge had found anything wrong with the testimony he would not have let the jury hear it. *Id.* at 508, 546 S.E.2d at 374. The defendant objected, and the trial court erroneously overruled the defendant's objection in *Allen. Id.* This case differs from *Allen* in three pointed respects: First, the argument in *Allen* conveyed plainly and clearly that the trial court had an opinion on the evidence; second, the trial court's overruling of the defendant's objection in *Allen* solidified in the minds of the jury that the trial court did hold the opinion intimated by the prosecution; and finally in *Allen* the prosecutor's argument traveled outside the record. *Id.* at 508-09, 546 S.E.2d at 374-75.

STATE v. DUKE

[360 N.C. 110 (2005)]

Here, the prosecution's statement did not directly and unambiguously tell the jury the court formed an opinion on the evidence. Also, because there was no objection, and therefore no overruling by the trial court of defendant's objection, this idea was not solidified in the jurors' minds. Additionally, the prosecution's argument did not travel outside the record as prohibited by N.C.G.S. § 15A-1230(a) (2003). Finally, the trial court instructed the jury the court was impartial and the jury would be mistaken to believe otherwise. The trial court instructed the jury it "may" find premeditation and deliberation, and instructed on what basis the jury could make such a finding. Therefore, this assignment of error is overruled.

[3] Defendant further contends the trial court's instruction to the jury regarding confession constitutes reversible error. Although defendant did not object to the giving of this instruction, any error is still preserved for appeal. Whenever a defendant alleges a trial court made an improper statement by expressing an opinion on the evidence in violation of N.C.G.S. §§ 15A-1222 and 15A-1232, the error is preserved for review without objection due to the mandatory nature of these statutory prohibitions. *See State v. Young*, 324 N.C. 489, 494, 380 S.E.2d 94, 97 (1989).

In the instant case, the trial court instructed the jury as follows:

There is evidence which tends to show that the defendant confessed that he committed the crime charged in this case. If you find that the defendant made that confession, then you should consider all of the circumstances under which it was made in determining whether it was a truthful confession and the weight that you will give it.

This instruction conforms to the North Carolina Pattern Jury Instruction on confession. 1 N.C.P.I.—Crim. 104.70 (2005). An instruction by the trial court stating the evidence tends to show the existence of a confession to the crime charged is not an impermissible comment invading the province of the jury and its fact-finding function. *See Young*, 324 N.C. at 495, 380 S.E.2d at 97; *see also State v. Allen*, 301 N.C. 489, 497, 272 S.E.2d 116, 121 (1980); *State v. Huggins*, 269 N.C. 752, 754-55, 153 S.E.2d 475, 477 (1967) (per curiam).

This Court noted in *Young*:

The [confession] instruction should not be given in cases in which the defendant has made a statement which is only of a generally inculpatory nature. When evidence is introduced which

would support a finding that the defendant in fact has made a statement admitting his guilt of the crime charged, however, the instruction is properly given.

324 N.C. at 498, 380 S.E.2d at 99. Considering defendant's admissions which tend to show premeditation and deliberation—such as the sheer number of blows with the fire extinguisher, the time between each blow, and the dragging of one victim back into the apartment— the statement did support inclusion of the confession instruction. The instruction given by the trial court left it to the jury to conclude whether the confession occurred and what weight to give it. *See State v. Cannon*, 341 N.C. 79, 90-91, 459 S.E.2d 238, 245-46 (1995).

In addition, defendant cannot show prejudice on this issue. It appears from the transcript it was defendant, not the prosecution, who requested this jury instruction. "A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." N.C.G.S. § 15A-1443(c) (2003). Furthermore, "[a] criminal defendant will not be heard to complain of a jury instruction given in response to his own request." *State v. McPhail*, 329 N.C. 636, 643, 406 S.E.2d 591, 596 (1991). Any error in the giving of this jury instruction was invited by defendant and we therefore overrule defendant's assignment of error on this issue.

## PENALTY PROCEEDING ISSUES

[4] Defendant assigns as error the admission of testimony concerning a threat made by defendant to Charlene McKinney, contending this evidence should not have been admitted during the penalty proceeding of defendant's trial. We disagree. During direct examination by defendant, McKinney stated while defendant lived with her, it was "a big happy family," and "he's not an animal. He really is a decent, kind human being if you knew him." On cross-examination, it was proper for the prosecution to attack the credibility of the witness and also to discredit the witness's contention defendant was peaceful by showing he threatened the lives of McKinney, her child, and her husband after an argument concerning a funeral. The prosecution simply impeached the witness with her prior inconsistent statements to a detective concerning the threats which clearly contradicted her direct testimony. While the Rules of Evidence are not binding in a penalty proceeding, they do provide us with guidance. *See State v. Greene*, 351 N.C. 562, 568, 528 S.E.2d 575, 579, *cert. denied*, 531 U.S. 1041 (2000). When a witness gives his or her opinion as to the character of another, the cross-examiner may test that opinion with ques-

**STATE v. DUKE**

[360 N.C. 110 (2005)]

tioning on specific acts of conduct. *See* N.C.G.S. § 8C-1, Rule 405(a) (2003). Therefore, in addition to questioning McKinney regarding prior inconsistent statements, the prosecution could challenge her opinion by questioning her on defendant's specific acts of conduct.

Additionally, "[i]n order to prevent an arbitrary or erratic imposition of the death penalty, the [S]tate must be allowed to present, by competent relevant evidence, any aspect of a defendant's character or record and any of the circumstances of the offense that will substantially support the imposition of the death penalty." *State v. McDougall*, 308 N.C. 1, 23-24, 301 S.E.2d 308, 322, *cert. denied*, 464 U.S. 865 (1983). The evidence concerning the threat, while also impeaching McKinney and challenging her opinion, went directly to the heart of defendant's violent nature.

In like manner, the prosecution was entitled to submit evidence contrary to the assertion of one of defendant's proposed mitigating circumstances. Defendant submitted and the trial court approved a mitigating circumstance be given to the jury that defendant had a deep emotional bond with McKinney. Evidence which tends to undermine a mitigating circumstance is competent and relevant in penalty proceedings. Defendant had threatened the life of the very person he alleged a deep emotional bond with, and the prosecution's questioning made that nonstatutory mitigating circumstance less likely to be true. We therefore overrule defendant's assignment of error.

**[5]** Defendant's next contention is the trial court erred in sustaining the prosecution's objection to his mother's statement during the penalty proceeding that defendant wanted to apologize to the victims' families. Defense counsel asked defendant's mother if she wanted to say anything to the victims' families. Her response in part was: "I just wanted to apologize to all of you. Jeff wants to apologize." The prosecution objected and the judge ordered the last answer stricken and not considered by the jury.

Evidence a defendant harbors feelings of remorse regarding a homicide is relevant evidence to be considered by the jury in a capital sentencing proceeding. *See State v. Jones*, 339 N.C. 114, 153-54, 451 S.E.2d 826, 847 (1994), *cert. denied*, 515 U.S. 1169 (1995). In both *Jones, id.*, and *State v. Garcia*, 358 N.C. 382, 420, 597 S.E.2d 724, 750 (2004), *cert. denied*, —— U.S. ——, 125 S. Ct. 1301, 161 L. Ed. 2d 122 (2005), this Court found the exclusion of evidence of remorse to be error subject to constitutional harmless error review. For an error to be harmless under the constitutional harmless error review standard,

the appellate court must find the error harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2003); *State v. Lewis*, 360 N.C. 1, 28, 619 S.E.2d 830, 847-48 (2005). In both *Jones* and *Garcia*, this Court held exclusion of evidence of remorse to be harmless beyond a reasonable doubt. We also hold any possible error as to this issue in the case *sub judice* harmless beyond a reasonable doubt.

First, any possible error was caused by defendant's failure to offer a proper foundation to ensure the reliability of the testimony from his mother. Although the prosecution did not state its basis for the objection, it is clear from the context of the objection the prosecution objected to the speculative nature of the statement, "Jeff wants to apologize." Unlike *Jones* and *Garcia*, no foundation was laid by defendant for the witness's basis of such knowledge of defendant's state of mind.

Second, the jury heard other sufficient testimony of defendant's remorse during the penalty proceeding through Dr. Hilkey, who opined defendant was remorseful for his actions. Even though the evidence of remorse was not disputed by other testimony, the jury was free to believe whom they would on the stand, and we find any error in the exclusion of this evidence harmless beyond a reasonable doubt. *See State v. Daughtry*, 340 N.C. 488, 518-19, 459 S.E.2d 747, 762-63 (1995), *cert. denied*, 516 U.S. 1079 (1996).

**[6]** Defendant additionally claims his mother should have been allowed to testify, in her opinion, her son would adjust well to prison life. Evidence of whether a defendant would adjust well to prison life is a relevant consideration in the imposition of the death penalty. *See Skipper v. South Carolina*, 476 U.S. 1, 6-8 (1986). "A capital defendant is permitted to introduce evidence from a disinterested witness that the defendant has adjusted well to confinement." *State v. Smith*, 359 N.C. 199, 216, 607 S.E.2d 607, 620 (2005). We note from the outset defendant's mother may not be a disinterested witness. Even if defendant's mother should have been allowed to testify as to defendant's adjustment to prison life, we find any error in its exclusion harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2003); *Lewis*, 360 N.C. at 28-29, 619 S.E.2d at 847-48. Three other witnesses gave testimony from which the jury could have found defendant would adjust well to prison life. Tom Patterson testified defendant did well in the structured setting of a group home. Charlene McKinney testified defendant did well at the group home because of the structured environment, and Dr. Hilkey testified defendant's prior

instance of lashing out in jail would probably not be repeated in prison because of the differences in structure and the benefit of proper administration of defendant's medications. We overrule this assignment of error.

[7] Defendant argues the trial court erred in sustaining the prosecution's objection when defendant's sister, Charlene McKinney, testified, "[defendant was] just caught in a bad situation. I mean, he didn't intend for this to happen." Once again, defendant failed to lay a proper foundation for testimony concerning his mental state. Regardless, we find any error in the exclusion of this testimony to be harmless beyond a reasonable doubt.

First, it appears from the context of the testimony McKinney was speaking of all the actions of the night and early morning of the murders, and not the murders in particular. The jury already decided in the guilt-innocence proceeding defendant intended to commit these murders. Although the word "intend" was used in McKinney's testimony, the word was not used in its legal sense as an element of first-degree murder. Therefore, this testimony is not designed to raise a residual doubt as to defendant's guilt as the State suggests in its brief.

Taken in context, McKinney's testimony tended to show defendant was a good person and not a "monster." Had there been a proper foundation, defendant should have been allowed to present this testimony of his good character. *See e.g.* N.C.G.S. § 15A-1340.16(e)(12) (Supp. 2005) (good character as mitigating factor under the Structured Sentencing Act applied to non-capital cases). We need not determine whether this alleged error rises to the level of a constitutional violation because we find any error to be harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2003); *Lewis*, 360 N.C. at 28-29, 619 S.E.2d at 847-48. First, defendant did not submit for consideration a good character mitigating circumstance. Second, defendant's mother, his son, and Matthew Forbis, a childhood friend of defendant, testified to facts and circumstances which tended to show defendant was a good person. We overrule this assignment of error.

[8] Defendant argues the trial court erred by failing to intervene *ex mero motu* in the prosecution's penalty proceeding closing argument when the prosecution referred to defendant's expert witness, Dr. Hilkey, as the "$15,000 man." The prosecution's argument was as follows:

**STATE v. DUKE**

[360 N.C. 110 (2005)]

Let's talk about his mental state. We heard from Dr. Hilkey there, the $15,000 man. Qualified medical or psychological experts can review the same material, yet come to different opinions. We know this, because Dr. Holly Rogers we heard about— we didn't hear from her, but in 1999 or 2000 or around about that time diagnosed the defendant as having intermittent explosive disorder or rage disorder. Dr. Hilkey: No, he didn't have that, according to Dr. Hilkey. Dr. Hilkey tells us that—well, let me back up a minute. In fact, there were different diagnoses given by qualified people over the course of these years. One of them diagnosed him with schizophrenia. Dr. Hilkey says no, he's not schizophrenic. Dr. Hilkey says, well, Dr. Rogers—let me back up a minute, now—if you recall diagnosed him as having antisocial, or being—having antisocial personality, which is—which Dr. Hilkey confirms that he's got. Yes, in fact, he does have traits similar to antisocial personality disorder. Dr. Hilkey didn't specifically diagnose him with that but indicated that he has antisocial features. Well, you folks may recall that antisocial personality disorder is what used to be called psychopathic, sociopathic. It's now called antisocial. A rose, folks, by any other name is still a rose. What you and I call mean, nasty, evil, vicious, Dr. Hilkey calls antisocial. We have now sanitized all these behaviors and called them— wrapped them up in nice, neat little packages and given them psychological names. There is a psychological diagnosis for someone who drinks too much coffee: Caffeine-induced disorder. That's what we learned from the $15,000 man. Mr. Duke knows right from wrong; he's not crazy, he's not stupid. He's vicious and he's selfish.

In hotly contested cases such as this capital trial, defense counsel and the prosecution are given wide latitude in arguments, and a trial court is not required to intervene *ex mero motu* unless the argument was so grossly improper it must be said the trial court abused its discretion by not intervening. *See State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161 (1999). In fact, "[t]o establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *Id.* (citing *State v. Rose*, 339 N.C. 172, 202, 451 S.E.2d 211, 229 (1994), *cert. denied*, 515 U.S. 1135 (1995)).

We recently discussed this issue in *State v. Campbell*, in which a prosecutor stated during closing arguments:

"Well, Doctor, don't they say you can't do that? Don't your own colleagues say you can't do that. Yes, but they're not paying my bill. That's what he wanted to say. They are. (Indicating.) . . . Enter Dr. Corvin. The best witness—well, I'm not going to say that. A witness that the defendant could buy. . . .

"[As defendant:] Well, Doctor, can't you do something? We're paying good money for this.

"[As Dr. Corvin:] Yes. Let me think out of the box. Let me just—all right, I got it, I got it. Go with me now, go with me. I'm a doctor, we all agree, I'm a doctor.

. . . .

"MR. DAVID: Let me repeat that. He's a doctor. He's a doctor. So the first thing is, twinkies defense, hyperthyroidism. That's something, that's medical, they're not going to know what that means. A Pender jury? I'm s[m]arter than them, coming from Raleigh."

The prosecutor continued regarding Dr. Corvin's assessment of defendant's alcohol abuse, stating that whether defendant was in denial "depends [on] if the evidence hurts us or helps us."

359 N.C. 644, 677, 617 S.E.2d 1, 22 (2005) (brackets in original). We concluded in *Campbell* the prosecution's statements were not grossly improper. In doing so, this Court noted: " '[I]t is not improper for the prosecutor to impeach the credibility of an expert during his closing argument.' " *Id.* (quoting *State v. Norwood*, 344 N.C. 511, 536, 476 S.E.2d 349, 361 (1996), *cert. denied*, 520 U.S. 1158 (1997)).

Although we have found grossly improper the practice of flatly calling a witness or opposing counsel a liar when there has been no evidence to support the allegation, we have also held that it is proper for a party to point out potential bias resulting from payment that a witness received or would receive for his or her services. However, where an advocate has gone beyond merely pointing out that the witness' compensation may be a source of bias to insinuate that the witness would perjure himself or herself for pay, we have expressed our unease while showing deference to the trial court.

*State v. Rogers*, 355 N.C. 420, 462-63, 562 S.E.2d 859, 885 (2002) (citations omitted). In *Rogers*, this Court found it improper, but not so grossly improper as to require *ex mero motu* intervention, when the

prosecutor strongly insinuated the defendant's expert would say anything to get paid. *Id.* at 464, 562 S.E.2d at 886. Additionally, we have found *ex mero motu* intervention to be required when the statements made by the prosecution were so overreaching as to shift the focus of the jury from its fact-finding function to relying on its own personal prejudices or passions. Such overreaching arguments will not be tolerated by this Court, and we would not hesitate to vacate a sentence or conviction on these grounds. *See State v. Jones*, 355 N.C. 117, 133-34, 558 S.E.2d 97, 107-08 (2002) (vacating death sentence when prosecutor made the grossly improper statement: "You got this quitter, this loser, this worthless piece of—who's mean . . . . He's as mean as they come. He's lower than the dirt on a snake's belly.").

While we do not condone the prosecution's name-calling or encourage other improper arguments, we do not believe the statement made by the prosecutor in the case *sub judice* was grossly improper. The prosecution's statement emphasized Dr. Hilkey's fee in the case was $15,000 and the jury should take that fact into account when determining the credibility of Dr. Hilkey and the weight it should place on his testimony. Considering the statements made by prosecutors in our prior cases that have found no gross impropriety requiring *ex mero motu* intervention by the trial court, we find the prosecution's closing argument in this case tame by those standards. Accordingly, we overrule defendant's assignment of error.

[9] In addition, defendant claims the trial court should have intervened *ex mero motu* when the prosecution used the word "crap" during penalty proceeding closing arguments. The prosecutor stated:

> We all have issues in our family, every one of us..Every one of us. Mr. Duke was given every opportunity, every chance to be part of a loving, warm environment, and chose not to. He chose not to be part of that. You know, I was waiting to hear from his family members, based on what we saw, that the defendant was tortured, locked in a closet, beaten severely by his mother or Mr. Fincher. Where was that? Where was any of that? On the contrary, what you heard was they did everything they could to provide for him, but he didn't care. Warm, loving home? Who needs that when there's crap?

We note first of all the word "crap" makes absolutely no sense in this context. We do not find it proper to hypothesize, however we cannot help but wonder if a transcription error in fact occurred. Regardless of any possible transcription error, we analyze this

STATE v. DUKE

[360 N.C. 110 (2005)]

statement as if the word "crap" was actually used by the prosecutor during the argument. Defendant relies heavily on our prior decision in *State v. Matthews*, 358 N.C. 102, 591 S.E.2d 535 (2004). This case is clearly distinguishable from *Matthews*. In *Matthews*, the prosecutor summarized all of the mitigating evidence presented by the defendant during the penalty proceeding of his trial and then dismissed it by telling the jury the evidence was "bull crap." *Id.* at 111, 591 S.E.2d at 542.

This Court noted in *Matthews* the prosecution's argument was improper because of the name-calling and scatological language. This Court "admonish[ed] the attorneys and trial courts of this State to reevaluate the need for melodrama and theatrics over civil, reasoned persuasion." *Id.* at 112, 591 S.E.2d at 542. In the case at bar, the prosecution did not engage in any name-calling nor did the prosecutor improperly disparage defendant's argument. Instead, the prosecutor took defendant's evidence as it was, and, albeit in less than professional terms, discussed the choice defendant made to turn his back on his family and pursue instead a life of drug abuse, alcohol abuse, and violence, which culminated in a senseless and brutal double murder. We cannot say this argument was so grossly improper as to require the trial court to intervene *ex mero motu*, and we therefore overrule defendant's assignment of error.

[10] Defendant contends the trial court erred in refusing to grant defendant's request to give the jury peremptory instructions on the N.C.G.S. § 15A-2000(f)(2) and (f)(6) mitigating circumstances. We disagree. It is well established a defendant is entitled to peremptory instructions on a mitigating circumstance whenever the evidence supporting the mitigating circumstance is uncontroverted. *See State v. Holden*, 338 N.C. 394, 402-03, 450 S.E.2d 878, 882 (1994). "[W]e have held that it is not error for a trial court in a capital case to refuse to give requested instructions where counsel failed to submit the instructions to the trial court in writing." *State v. White*, 349 N.C. 535, 570, 508 S.E.2d 253, 275 (1998). There is nothing in the record or the transcript to indicate such a request was made in writing by defendant. That said, even if the requested instructions had been submitted in writing the evidence supporting the (f)(2) and (f)(6) mitigating circumstances was simply not uncontroverted.

N.C.G.S. § 15A-2000(f)(2) provides a statutory mitigating circumstance of: "The capital felony was committed while the defendant was under the influence of mental or emotional disturbance." Here, defendant presented evidence he suffered from mental or emotional

disturbance through his expert witness Dr. Hilkey. Dr. Hilkey, while giving his opinion defendant committed these murders under the influence of mental or emotional disturbance, also admitted on cross-examination two clinicians could come to different conclusions. Additionally, Dr. Hilkey testified as to inconsistent diagnoses of defendant's condition determined by other mental health professionals in the past. Clearly, the evidence of defendant's mental or emotional disturbance was not uncontroverted, as established by the cross-examination made by the prosecution. Therefore, defendant was not entitled to a peremptory instruction on the (f)(2) mitigating circumstance.

Additionally, defendant was not entitled to a peremptory instruction on the (f)(6) mitigating circumstance which provides: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." While defendant submitted evidence that tended to show this mitigating circumstance existed, that evidence was not uncontroverted. In fact, during the guilt-innocence proceeding of the trial, the prosecution introduced evidence tending to show defendant knew what he did was wrong such as turning out·Grant's pants pockets, pulling Arthurs's pants down to his knees, and ransacking the apartment—all to make it appear a robbery occurred. In addition, defendant fled the scene of the crime, destroyed potential evidence, attempted to destroy other evidence by discarding it across the state line, and encouraged his sister to lie in order to provide him an alibi. Surely the jury could have reasonably found from this evidence defendant knew and appreciated the criminality of his actions. Because defendant's evidence on this matter was not uncontroverted, we overrule this assignment of error.

[11] Defendant assigns as error the denial of his request to submit to the jury a non-statutory mitigating circumstance of: "Jeff's actions towards these victims were influenced to some degree by their behavior towards him and he reacted to what he thought was provocation on the part of the victims." As a general rule, a defendant is allowed to submit to the jury any mitigating circumstance that a jury could reasonably find to have mitigating value and has sufficient evidence to support it. See State v. Daughtry, 340 N.C. at 523, 459 S.E.2d at 765. However, this does not mean defendant is entitled to place the question of his guilt of first-degree murder back onto the table for the jury to decide. The jury decided during the guilt-innocence proceeding defendant was guilty .of first-degree murder, rejecting his con-

tention he acted under perceived provocation. We therefore overrule this assignment of error.

[12] Defendant contends reversible error occurred when the trial court reinstructed the jury on mitigating circumstances after the jury submitted a question to the court seeking clarification. We note at the outset defendant did not object to the instruction given in response to the jury's question. Therefore, we analyze the instruction for plain error. *See* N.C. R. App. P. 10(b)(1); 10(c)(4); *State v. Cummings*, 352 N.C. 600, 613, 536 S.E.2d 36, 47 (2000) (explaining that plain error review will be applied only to matters of evidence and jury instructions), *cert. denied*, 532 U.S. 997 (2001).

The jury's question read as follows: "Please explain the way we should weigh issue 2? Ex: Does [sic] each of these questions have a direct impact on the deaths of the two victoms [sic]. OR Ex: Does [sic] each of these questions prove that Jeff Duke should live in prison or death [sic]." The trial court, after conferring with counsel and without objection, decided to reinstruct the jury on mitigating circumstances. The trial court instructed the jury as follows:

> Our law identifies several possible mitigating circumstances. However in considering Issue Number 2, it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character and any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death and any other circumstances arising from the evidence which you deem to have mitigating value.
>
> . . . .
>
> A juror may find that any mitigating circumstance exists by a preponderance of the evidence, whether or not that circumstance was found to exist by all the jurors. In any event, you would move on to consider the other mitigating circumstances and continue in like manner until you have considered all of the mitigating circumstances listed on the form and any others which you deem to have mitigating value.

These instructions follow the pattern jury instructions on Issue Two of the Issues and Recommendation as to Punishment Form provided to the jury for their deliberations. However, the trial court did not continue by giving specific instructions on each mitigating factor. Defendant contends the jury was therefore confused and could have believed statutorily enumerated mitigating circumstances may not be

taken into consideration unless the jury finds those circumstances to have mitigating value. We disagree.

Defendant is correct in asserting statutory mitigating circumstances have mitigating value as a matter of law, while nonstatutory mitigating circumstances require a finding of mitigating value by the jury. *See* N.C.G.S. § 15A-2000(f) (2003); *State v. Walters*, 357 N.C. 68, 92, 588 S.E.2d 344, 358, *cert. denied*, 540 U.S. 971 (2003). While defendant asserts a correct proposition of law, the instructions given by the trial court are not contrary to that law.

On the Issues and Recommendation as to Punishment Form for each murder, the final question under Issue Two is whether any juror found "[a]ny other circumstance or circumstances arising from the evidence which one or more of you deems to have mitigating value." The form contains lines after this question for the juror or jurors to write the mitigating circumstance found, if any. It is clear from the instructions given by the trial court—"any other circumstances arising from the evidence which you deem to have mitigating value"—refers to this final question. The trial court advised the jury to decide the listed mitigating circumstances as it previously instructed, and "any others which you deem to have mitigating value." The trial court did not instruct the jurors the statutory mitigators were not to be found unless the jury concluded they had mitigating value. If any error occurred in the re-instruction, this error was to defendant's benefit because it implied all the listed circumstances had some mitigating value, rather than instructing the jury it should not find a nonstatutory mitigating circumstance unless it deemed that circumstance to exist and have mitigating value.

This case is clearly distinguishable from *State v. Jaynes*, 342 N.C. 249, 464 S.E.2d 448 (1995), *cert. denied*, 518 U.S. 1024 (1996), and *State v. Howell*, 343 N.C. 229, 470 S.E.2d 38 (1996), both of which defendant cites in support of this assignment of error. In *Jaynes*, the trial court instructed the jury: "it is for you to determine from the circumstances and the facts in this case whether or not *any listed circumstance* has mitigating effect." 342 N.C. at 285, 464 S.E.2d at 470. In *Howell*, the trial court instructed the jury in a manner substantially similar to that in *Jaynes*. 343 N.C. at 239-40, 470 S.E.2d at 43-44. In the case *sub judice*, the trial court instructed the jury should *only* consider whether a mitigating circumstance had mitigating value if it found a circumstance which was not listed on the Issues and Recommendation as to Punishment Form. Defendant's assignment of error is overruled.

## STATE v. DUKE

[360 N.C. 110 (2005)]

**[13]** Defendant's current appeal resulted from a new trial granted by this Court because the transcription notes and tapes in defendant's first capital trial were unavailable, thereby preventing preparation of a transcript for appellate review. *See State v. Duke*, 354 N.C. 367, 556 S.E.2d 295 (2001). Defendant argues because the trial court did not submit the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance as to the murder of Arthurs during the penalty proceeding of defendant's first trial, the trial court violated the bar against double jeopardy by submitting the circumstance in the present case. We disagree. This Court held in *State v. Sanderson* the bar against double jeopardy does not prevent a sentence of death unless a jury finds no aggravating circumstance existed in a prior trial and thereby would have been required to recommend a sentence of life imprisonment without parole. 346 N.C. 669, 679-80, 488 S.E.2d 133, 138-39 (1997). This Court wrote:

> In the present case, neither the jury at the first capital sentencing proceeding nor the jury at the second capital sentencing proceeding found that no aggravating circumstance existed. To the contrary, each of those juries found at least one aggravating circumstance to exist and recommended a sentence of death. Therefore, principles of double jeopardy did not prevent the trial court from submitting this case to the jury at defendant's third capital sentencing proceeding for its consideration of all aggravating circumstances supported by evidence adduced at that third capital sentencing proceeding for the jury's determination as to whether death or life imprisonment was the appropriate penalty in this case.

*Id.* at 679, 488 S.E.2d at 138. Similarly, in this case, during the first trial the jury found an aggravating circumstance and recommended death for defendant's murder of Arthurs.

We also reject defendant's argument that the holding in *Ring v. Arizona*, 536 U.S. 584 (2002), changes this result. *Ring* simply requires the jury, rather than the trial court, to find any aggravating circumstance which leads to the imposition of the death penalty. *Id.* at 587, 609. As the Supreme Court noted in *Ring*, North Carolina law required the finding of aggravating circumstances by the jury before the federal constitutional mandate to do so. *Id.* at 608 n.6. "[T]he judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant (*i.e.*, require the death penalty), and the failure to find any particular aggravating circumstance does not

'acquit' a defendant (*i.e.*, preclude the death penalty)." *Poland v. Arizona*, 476 U.S. 147, 156 (1986). In *Sattazahn v. Pennsylvania*, a post-*Ring* case, the defendant was convicted of first-degree murder and sentenced to life in prison as an operation of law due to a hung jury in his first penalty proceeding. 537 U.S. 101, 103-05 (2003). Upon retrial, after the reversal of the defendant's conviction, a second jury found the defendant guilty and sentenced him to death. *Id.* The Supreme Court rejected the defendant's claim double jeopardy barred such a result and affirmed the death sentence of the defendant. *Id.* at 109-10; *see also id.* at 117 (O'Connor, J., concurring). In the case *sub judice*, the jury in defendant's first trial recommended death, and the jury in defendant's second trial recommended death. Therefore, we overrule defendant's assignment of error.

[14] Defendant also contends his constitutional rights were violated because the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad, and this vagueness cannot be cured through appellate narrowing after *Ring v. Arizona*. We note initially defendant did not raise this specific Sixth Amendment argument at the trial court, and, as a general rule, this Court will not hear for the first time constitutional arguments on appeal. *See State v. Benson*, 323 N.C. 318, 321-22, 372 S.E.2d 517, 519 (1988). Nevertheless, as a decision on this matter is in the public interest, we will address this issue to further develop our jurisprudence. *See* N.C. R. App. P. 2.

In upholding the constitutionality of Arizona's "especially heinous, cruel or depraved" aggravating circumstance in *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, the Supreme Court of the United States distinguished two of the cases cited by defendant on this issue: *Maynard v. Cartwright*, 486 U.S. 356 (1988) (Oklahoma's "especially heinous, atrocious, or cruel" standard unconstitutionally vague) and *Godfrey v. Georgia*, 446 U.S. 420 (1980) (Georgia's "outrageously or wantonly vile, horrible, or inhuman" circumstance unconstitutionally vague). In distinguishing these cases, the Court in *Walton* reasoned: "Neither jury was given a constitutional limiting definition of the challenged aggravating factor. Second, in neither case did the state appellate court, in reviewing the propriety of the death sentence, purport to affirm the death sentence by applying a limiting definition of the aggravating circumstance to the facts presented." *Id.*

We disagree with defendant's contention for two reasons. First, this Court has held the pattern jury instruction, 1 N.C.P.I.—Crim.

150.10 (2004), is not unconstitutionally vague or overbroad with regards to the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance. *See State v. Syriani*, 333 N.C. at 388-92, 428 S.E.2d at 138-41. In *State v. Syriani*, this Court stated: "Because these jury instructions incorporate narrowing definitions adopted by this Court and expressly approved by the United States Supreme Court, or are of the tenor of the definitions approved, we reaffirm that these instructions provide constitutionally sufficient guidance to the jury." *Id.* at 391-92, 428 S.E.2d at 141. As this Court held in *Syriani*, the pattern jury instruction given in the instant case was a sufficient limiting instruction which cures any vagueness or overbreadth of the especially heinous, atrocious, or cruel aggravating circumstance. This Court's appellate narrowing of the especially heinous, atrocious, or cruel aggravating circumstance has been incorporated into the pattern jury instruction.

Second, we fail to see how conducting appellate review of a question submitted to the jury somehow makes this Court a co-finder of fact with the jury in violation of *Ring*. Defendant asserts in his brief that appellate narrowing, as allowed by *Walton*, "no longer passes constitutional muster." In support of this argument, defendant cites only a footnote from a recent decision of the Supreme Court of the United States, *Bell v. Cone*, __ U.S. __, 125 S. Ct. 847, 852 n.6, 160 L. Ed. 2d 881, 891 n.6 (2005) (per curiam). This footnote merely summarizes the holding in *Ring* and states the inapplicability of *Ring* to *Bell v. Cone*, as the *Bell* case was tried before *Ring* was announced and the Court's decision in *Ring* is not retroactive. Therefore, the *Bell* Court did not have before it the issue of whether appellate narrowing of vague aggravating circumstances post-*Ring* is constitutional. We decline to make the logical jump defendant makes that a mere statement indicating an issue is not before the Court means an overruling of prior precedent.

Further, we note this argument by defendant is speculative in nature. Defendant did not assert in his brief or at oral argument that the murders committed by him were not especially heinous, atrocious, or cruel or for some reason require appellate narrowing. Therefore, we will only determine, during proportionality review, the sufficiency of the evidence in the record to determine if it supports the finding of the aggravating circumstance by the jury. In this determination, the Court merely acts as all appellate courts do and determines if the sufficiency of the evidence submitted supported the finding of the jury. Defendant's argument that such review by an

appellate court somehow makes that court a co-finder of fact with the jury in violation of *Ring* is without merit. In fact, if *Ring* imposes such a prohibition upon appellate courts, then, in any sentencing determination, defendants will no longer be allowed to request that a trial court or an appellate court determine whether a circumstance was supported by the evidence after that circumstance is found by the jury. This argument lacks merit, and therefore we overrule defendant's assignment of error on this issue.

### Constitutionality of "Issue Three"

[15] Defendant claims part of the applicable jury instructions and the Issues and Recommendation as to Punishment Form, both derived from N.C.G.S. § 15A-2000(b) and (c), violate his constitutional rights because if the jury determines the mitigating circumstances are equal in weight to the aggravating circumstances, the jury must continue its analysis instead of recommending life without parole. "Issue Number Three," as it is called by many attorneys, is derived from N.C.G.S. § 15A-2000(c), which provides in part: "When the jury recommends a sentence of death, the foreman of the jury shall sign a writing on behalf of the jury which writing shall show . . . the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found." The jury recommendation form in this case reads: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?" This instruction and the statute on which it is based do not violate defendant's constitutional rights.

We note at the outset defendant did not object to the instruction given, nor was there any indication of equipoise in the record. Therefore, we analyze the instruction for plain error based upon defendant's facial challenge to the instruction on appeal. *See* N.C. R. App. P. 10(b)(1); 10(c)(4); *Cummings*, 352 N.C. at 613, 536 S.E.2d at 47. A reversal for plain error is only appropriate in the most exceptional cases.

The plain error rule applies only in truly exceptional cases. Before deciding that an error by the trial court amounts to "plain error," the appellate court must be convinced that absent the error the jury probably would have reached a different verdict. *State v. Odom*, 307 N.C. at 661, 300 S.E.2d at 378-79. In other words, the appellate court must determine that the error in ques-

tion "tilted the scales" and caused the jury to reach its verdict convicting the defendant. *State v. Black*, 308 N.C. at 741, 303 S.E.2d at 806-07. Therefore, the test for "plain error" places a much heavier burden upon the defendant than that imposed by N.C.G.S. § 15A-1443 upon defendants who have preserved their rights by timely objection. This is so in part at least because the defendant could have prevented any error by making a timely objection. *Cf.* N.C.G.S. § 15A-1443(c) (defendant not prejudiced by error resulting from his own conduct).

*State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83-84 (1986). We do not find plain error in the trial court's instruction on "Issue Three."

The Supreme Court of the United States has held that states are free to enact and enforce the death penalty so long as (1) the jury has guided discretion that includes the ability to consider and give effect to every mitigating circumstance, and (2) the statutory scheme does not automatically impose death for any certain type of murder. *See Walton v. Arizona*, 497 U.S. at 652; *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989); *see generally Woodson v. North Carolina*, 428 U.S. 280, 289-301 (1976) (plurality) (no automatic death penalty for first-degree murder). The Supreme Court of the United States does not impose any formulaic method for imposition of the death penalty and has stated: " '[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' " *Atkins v. Virginia*, 536 U.S. 304, 317 (2002) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986) (plurality) (alterations in original) (discussing the constitutional prohibitions on imposing the death penalty on persons who are mentally retarded and noting the States will apply their own definitions of mental retardation when determining which offenders are in fact retarded). "[T]he Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances . . . ." *Zant v. Stephens*, 462 U.S. 862, 890 (1983). A capital punishment scheme which requires a recommendation of death upon the finding of certain factors or circumstances does not violate the Constitution so long as the jury is allowed to consider and give effect to all relevant mitigating evidence. *See generally Boyde v. California*, 494 U.S. 370 (1990) (upholding California's capital punishment system which mandated death upon the jury's finding that the aggravating circumstances outweighed the mitigating circumstances); *Blystone v. Pennsylvania*, 494 U.S. 299 (1990) (upholding Pennsylvania's capital punishment scheme for the same reason).

"States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.' " *Boyde,* 494 U.S. at 377 (quoting *Franklin v. Lynaugh,* 487 U.S. 164, 181 (1988) (plurality)). North Carolina has done just that by enacting a capital punishment system which allows the jury, as part of its guided discretion, to weigh the mitigating circumstances against the aggravating circumstances. *See* N.C.G.S. § 15A-2000 (2003). In addition, North Carolina's capital punishment scheme does not limit in any way the mitigating evidence the jury may consider in making its decision. *See id.* § 15A-2000(f)(9) ("Any other circumstance arising from the evidence which the jury deems to have mitigating value."); *see also Lockett v. Ohio,* 438 U.S. 586, 601 (1978) (plurality) (requiring the jury be allowed to consider all relevant mitigating evidence). In *Walton,* the Supreme Court of the United States looked at a very similar weighing process and held it was constitutionally sufficient for the legislature to require that the judge impose a sentence of death if "one or more aggravating circumstances are found and mitigating circumstances are held insufficient to call for leniency." 497 U.S. at 651. Our statute actually provides greater protection against the arbitrary imposition of death than the statute in *Walton* because our statute does not mandate death based solely upon the weighing of mitigating and aggravating circumstances. *See* N.C.G.S. § 15A-2000.

Finally, we note North Carolina's death penalty structure differs from the statute the Kansas Supreme Court recently struck down in *State v. Marsh,* 278 Kan. 520, 102 P.3d 445 (2004), *cert. granted,* —— U.S. ——, 125 S. Ct. 2517, 161 L. Ed. 2d 1109 (2005). Under our system, should the jury answer "Issue Three" in the affirmative, the jury is required to make one last decision of guided discretion—whether the aggravating circumstances are sufficiently substantial to call for imposition of the death penalty. Unlike the Kansas statute, a North Carolina jury's decision does not rest completely on the weighing of the mitigating circumstances against the aggravating circumstances. *See* Kan. Stat. Ann. § 21-4624(e) (2003); N.C.G.S. § 15A-2000. Assuming *arguendo* a constitutional violation occurs under the Kansas statute, our statutory scheme offers an additional layer of protection against the arbitrary imposition of the death penalty.

Accordingly, as we find no plain error in the instruction or the Issues and Recommendation as to Punishment Form, we overrule defendant's assignment of error.

## PRESERVATION ISSUES

Defendant contends his short-form indictment was insufficient because it failed to allege all the elements of the offense of first-degree murder. This Court has consistently ruled short-form indictments for first-degree murder are permissible under N.C.G.S. § 15-144 and the North Carolina and United States Constitutions. *See State v. Hunt,* 357 N.C. 257, 278, 582 S.E.2d 593, 607, *cert. denied,* 539 U.S. 985 (2003); *see also State v. Mitchell,* 353 N.C. 309, 328-29, 543 S.E.2d 830, 842, *cert. denied,* 534 U.S. 1000 (2001); *State v. Davis,* 353 N.C. 1, 44-45, 539 S.E.2d 243, 271 (2000), *cert. denied,* 534 U.S. 839 (2001); *State v. Braxton,* 352 N.C. 158, 173-75, 531 S.E.2d 428, 436-38 (2000), *cert. denied,* 531 U.S. 1130 (2001); *State v. Wallace,* 351 N.C. 481, 504-08, 528 S.E.2d 326, 341-43, *cert. denied,* 531 U.S. 1018 (2000). We see no compelling reason to depart from our prior precedent, and we find the indictment in this case met the requirements of N.C.G.S. § 15-144. Therefore, defendant's assignment of error is overruled.

Defendant claims the trial court committed error in failing to *sua sponte* inquire of defendant himself (instead of through counsel) whether he wanted to present evidence or testify on his own behalf during the guilt-innocence proceeding. This Court rejected this argument in *State v. Jones,* 357 N.C. 409, 417, 584 S.E.2d 751, 756-57 (2003), and decline to overrule that case. Defendant's assignment of error is overruled.

Defendant asserts the trial court erred in instructing the jury that each juror could ignore nonstatutory mitigating evidence if they found such evidence to be without mitigating value. This Court previously decided this issue contrary to defendant's position, and we find no reason now to overrule our prior precedent. *See e.g., State v. Payne,* 337 N.C. 505, 533, 448 S.E.2d 93, 109-10 (1994), *cert. denied,* 514 U.S. 1038 (1995). Therefore, defendant's assignment of error is overruled.

Defendant argues the trial court committed plain error by instructing the jury that defendant must prove mitigating circumstances to the "satisfaction" of the jurors. This Court considered this issue in *State v. Payne* and found it to lack merit. *Id.* at 531-33, 448 S.E.2d at 108-09. We find no reason to overrule *Payne,* and therefore we reject defendant's assignment of error.

Defendant contends the jury instructions for Issues Three and Four of the penalty proceeding impermissibly used the word "may"

thereby permitting, but not requiring, each juror to weigh the mitigating circumstance he or she may have found by a preponderance of the evidence under Issue Two. This Court considered this argument previously in *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*, 513 U.S. 891 (1994) and *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied*, 513 U.S. 1134 (1995) and have found it without merit. Defendant has presented no compelling reason, nor do we find any compelling reason, to overrule our prior holdings on this issue. Therefore, we must overrule defendant's assignment of error on this issue.

Defendant claims the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 19, 23, and 27 of the North Carolina Constitution. He also argues the North Carolina capital sentencing statute, N.C.G.S. § 15A-2000, is vague and overbroad; allows juries to make excessively subjective sentencing determinations; is applied arbitrarily and on the basis of race, sex, and poverty; and violates Article IV Section 2 of the United States Constitution because it violates international law. We note first defendant has abandoned all of these assignments of error because no authority or argument in support was given in defendant's brief. *See* N.C. R. App. P. 28(b)(6) ("Assignments of error *not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned.*"). Nonetheless, this Court has considered and rejected all these issues in past cases, and we decline to depart from our prior precedent. *See, e.g., State v. Williams*, 355 N.C. 501, 586, 565 S.E.2d 609, 658 (2002) (holding N.C.G.S. § 15A-2000 does not violate the International Covenant on Civil and Political Rights), *cert. denied*, 537 U.S. 1125 (2003); *State v. Williams*, 304 N.C. 394, 409-10, 284 S.E.2d 437, 448 (1981) (rejecting argument that death penalty is cruel and unusual and applied in an arbitrary manner on the basis of race), *cert. denied*, 459 U.S. 1056 (1982). Therefore, defendant's assignments of error are overruled.

### PROPORTIONALITY

[16] Pursuant to N.C.G.S. § 15A-2000(d)(2), this Court has the statutory duty to determine if:

> [T]he record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, or . . . the sentence of death was imposed under the influence of passion, prejudice, or any

other arbitrary factor, or . . . the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

N.C.G.S. § 15A-2000(d)(2).

Here the jury found three aggravating circumstances to exist beyond a reasonable doubt as to both murders: (1) defendant had been previously convicted of a felony involving the use of violence to the person; (2) the murders were especially heinous, atrocious, or cruel; and (3) the murders were part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against other persons. The trial court submitted the N.C.G.S. § 15A-2000(f)(2) and (f)(6) mitigating circumstances, along with thirty nonstatutory mitigating circumstances. No juror found either the (f)(2) or the (f)(6) mitigating circumstance as to either murder, but at least one juror found eleven nonstatutory mitigating circumstances as to each murder.

After a thorough review of the record, transcripts, briefs, and oral arguments on appeal, we conclude the jury's finding of the three aggravating circumstances is supported by the evidence. Additionally, we conclude nothing in the record, transcripts, briefs, or oral arguments suggests the sentence given defendant was imposed under the influence of passion, prejudice, or any other arbitrary factor. We will not disturb the jury's weighing of the mitigating and aggravating circumstances.

As a final matter, we must consider whether imposition of the death penalty is proportionate in this case. The decision as to whether the death sentence is disproportionate "ultimately [rests] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046 (1994). Proportionality review is intended to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Smith*, 357 N.C. 604, 621, 588 S.E.2d 453, 464 (2003) (citation omitted), *cert. denied*, 542 U.S. 941 (2004).

In our proportionality review, we compare the case at bar to cases in which this Court has found imposition of the death penalty to be disproportionate. This Court has previously determined that the death penalty was disproportionate in eight cases: *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled*

*in part on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

In none of the cases in which this Court found the death penalty disproportionate did the jury find the three aggravating circumstances the jury found in this case. In fact, in cases in which the jury found the murder to be especially heinous, atrocious, or cruel this Court has only found the death sentence to be disproportionate twice. *See State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653; and *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170. *Stokes* and *Bondurant* are easily distinguishable from this case. In *Stokes,* the defendant was only seventeen years old at the time of the killing, and he was the only one of four assailants to receive the death penalty. 319 N.C. at 3-4, 11, 352 S.E.2d at 654-55, 658. In this case, defendant was thirty years old at the time of the murders, and he committed both murders by himself. In *Bondurant,* the defendant expressed remorse immediately after the killing and even aided the victim in traveling to the hospital for treatment. 309 N.C. at 694, 309 S.E.2d at 182-83. In contrast defendant Duke plunged knives into the neck and chest of one victim and into the upper abdomen of the other after the victims were unconscious or dead from the violent blows of a fire extinguisher—a far cry from exhibiting remorse and aiding the victims in obtaining treatment.

"[W]e have never found a death sentence disproportionate in a double-murder case." *State v. Sidden,* 347 N.C. 218, 235, 491 S.E.2d 225, 234 (1997) (citing *State v. Conner,* 345 N.C. 319, 338, 480 S.E.2d 626, 635, *cert. denied,* 522 U.S. 876 (1997)), *cert. denied,* 523 U.S. 1097 (1998). We decline to do so here.

In proportionality review this Court also considers the brutality of the murders in question. *See State v. Reeves,* 337 N.C. 700, 740, 448 S.E.2d 802, 822 (1994) ("In determining proportionality, we are impressed with the cold-blooded, callous and brutal nature of this murder."), *cert. denied,* 514 U.S. 1114 (1995); *State v. Moseley,* 336 N.C. 710, 725, 445 S.E.2d 906, 915 (1994) ("In determining proportionality, we are impressed with the brutality and 'overkill' evidenced in this murder."), *cert. denied,* 513 U.S. 1120 (1995). The murders in this case were especially brutal. The evidence showed defendant brutally beat the victims with a blunt object—a fire extinguisher. Both

victims were found with their brains "smashed." The multiple blows from the fire extinguisher fractured both victims' skulls and caused immediate internal bleeding of the victims' brains. In addition, the violent blows from defendant's swings of the fire extinguisher forced Arthurs's brain into his spinal column. When Grant tried to leave the apartment, defendant grabbed him and pulled him back into the apartment so he could continue his savage beating. The autopsy showed multiple stab wounds to Grant's face and neck. The evidence showed not only did defendant stab his victims, but he moved the blades around inside their bodies, causing even more damage. To finish this brutality, defendant plunged knives into both sides of Grant's neck, into Grant's chest, and into Arthurs's upper abdomen, leaving a total of four knives in his victims' bodies.

"Although we 'compare this case with the cases in which we have found the death penalty to be proportionate . . . . we will not undertake to discuss or cite all of those cases each time we carry out that duty.' " *State v. Garcia*, 358 N.C. at 429, 597 S.E.2d at 756 (quoting *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254 (1994)). We have no difficulty finding the sentences received are proportionate when compared with our other cases. Therefore, we hold defendant's sentences are neither disproportionate nor excessive considering the nature of defendant and the crimes he committed.

NO ERROR.

Justice PARKER did not participate in the consideration or decision of this case.