STATE OF NORTH CAROLINA v. WILLIAM HENRY RAINES

No. 211A06

(Filed 7 December 2007)

**1. Jury— selection—potential juror—remark about reading material in newspapers**

The trial court did not err by not declaring a mistrial or dismissing the entire pool after a prospective juror (who was himself later dismissed for a different reason) said that he had read incriminating material about the case in the newspapers.

**2. Jury— selection—voir dire limited—peremptory challenges not exhausted—no prejudice**

A defendant who did not exhaust his peremptory challenges could not show prejudice from the judge's limiting of his voir dire questioning of prospective jurors, even assuming abuse of discretion.

**3. Evidence— discovery of body—reaction of parent—not prejudicial**

There was no prejudice from the admission of testimony about how a witness discovered her sister's death and about her mother's reaction to the news where the evidence of guilt was overwhelming.

1

**STATE v. RAINES**

\            [362 N.C. 1 (2007)]

### 4. Evidence— reaction of victims' son to death of parents— invited and not prejudicial

There was no prejudice from the admission of testimony about the reaction of the victims' son to the death of his parents where the exclusion of the testimony would not have changed the result. Moreover, the testimony came during a line of questioning by defendant, and any error was invited.

### 5. Criminal Law— prosecutor's argument—improprety—not prejudicial

The trial court did not abuse its discretion by allowing a portion of the State's closing argument which defendant asserted was a personal attack upon counsel. The prosecutor's comment was neither laudable nor appropriate, but it was not extreme, the evidence of guilt was overwhelming, and the argument was confounding as to its true meaning.

### 6. Criminal Law— prosecutor's argument—whether murder was provoked—not argument for jury nullification

A prosecutor's argument about whether a murder defendant was provoked (to which defendant did not object) was not so prejudicial as to require intervention ex mero motu. The prosecutor was not arguing for jury nullification as defendant contended, but that the jury should find defendant guilty of first-degree rather than second-degree murder. Moreover, the court instructed the jury that it was necessary to understand and apply the law as given.

### 7. Criminal Law— verdict form—not misleading

There was no error in the language in the verdict form in a first-degree murder prosecution where defendant asserted that the form suggested to the jurors that they were expected to find defendant guilty. The form was not improper or misleading, it did not nullify other options available to the jury, and there is no indication that the jury would have been confused.

### 8. Evidence— victim impact testimony—unfinished statement—not prejudicial

There was no prejudicial error in victim impact testimony in a first-degree murder sentencing hearing where the sister of one of the victims, who also knew defendant, began a sentence which was not finished after an objection. The jury did not hear the complete thought, and the appellate court will not

speculate that the witness was asking the jury to minimize mitigating evidence.

**9. Constitutional Law— Confrontation Clause—capital sentencing—detention center reports**

The Confrontation Clause rights of a first-degree murder defendant were not violated in a capital sentencing hearing where an officer at a detention center read from detention center incident reports. The reports were not testimonial in nature, nor were the statements contained therein testimonial. They were more like business records.

**10. Constitutional Law— First Amendment—defendant's use of racial epithet in prison—admissible in capital sentencing**

The First Amendment rights of a first-degree murder defendant were not violated in a capital sentencing hearing by the admission of a detention center report recounting defendant's use of a racial epithet toward another inmate. The context of the incident and the inflammatory nature of the word used by defendant were relevant to rebut the mitigating circumstance that defendant had demonstrated an ability to adapt to prison life.

**11. Constitutional Law— effective assistance of counsel—no prejudice**

Defendant was not denied the effective assistance of counsel at a capital sentencing proceeding through his attorney's failure to object to certain evidence where he could not show prejudice.

**12. Sentencing— hearsay—insufficient indicia of reliability**

The trial court did not err in a capital sentencing proceeding by determining that proposed hearsay about sexual abuse suffered by defendant lacked sufficient indicia of reliability. While the Rules of Evidence serve only as guidelines in capital penalty proceedings, the court may properly exclude hearsay statements which lack sufficient indicia of reliability or a sufficient foundation.

**13. Sentencing— defendant's childhood—basis for opinion required—offer of proof required**

The trial court did not err in a capital sentencing proceeding by insisting that defendant's witness explain the basis for her conclusion that defendant grew up in an injurious environment.

STATE v. RAINES

[362 N.C. 1 (2007)]

Moreover, the appellate court will not speculate about excluded answers for which no offer of proof was made.

**14. Sentencing— prosecutor's argument—final moments of victims' lives—defendant shifting blame—not grossly improper**

A prosecutor's closing arguments in the penalty phase of a first-degree murder prosecution concerning the final moments of the murdered victims' lives was not so grossly improper as to require intervention ex mero motu. A remark that defendant was probably blaming the prosecutor for trying to give him the death penalty was part of an argument that no one but defendant was to blame for his predicament and comes nowhere close to the level of gross impropriety.

**15. Sentencing— prosecutor's argument—mitigating value**

A prosecutor at a first-degree murder sentencing hearing did not argue that mitigating evidence must be connected to the crime, but that the evidence did not have mitigating value.

**16. Sentencing— capital—mitigating circumstances—mental or emotional disturbance—peremptory instruction not given—no written request—evidence controverted**

The trial court did not err by not giving a peremptory instruction in a capital sentencing proceeding that defendant was under the influence of mental or emotional disturbance. There is no record of defendant's written request for the instruction; even so, defendant was not entitled to it because the evidence was controverted and the jury would have been justified in rejecting it.

**17. Sentencing— capital—aggravating circumstances—robbery and pecuniary gain**

The trial court did not err in a capital sentencing proceeding by submitting the aggravating circumstances of pecuniary gain and that the murder was committed during the commission of a robbery where there was separate evidence of the aggravators.

**18. Sentencing— death—proportionality**

Sentences of death were proportionate, considering the brutality of the crimes and that the case was unlike any which have been found disproportionate, where defendant brutally beat both victims with a wrench and then fired bullets into their skulls for monetary gain.

**STATE v. RAINES**

[362 N.C. 1 (2007)]

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing a sentence of death entered by Judge Ronald K. Payne on 9 September 2005 in Superior Court, Henderson County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. On 31 October 2006, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 15 October 2007.

*Roy Cooper, Attorney General, by Joan M. Cunningham, Assistant Attorney General, and Robert C. Montgomery, Special Deputy Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Benjamin Dowling-Sendor, Assistant Appellate Defender, and Center for Death Penalty Litigation, by Jonathan E. Broun, for defendant-appellant.*

BRADY, Justice.

Defendant William Henry Raines was found guilty by a jury on 6 September 2005 of the first-degree murders of Phillip Lester Holder[1] and Pamela Kay Holder and robbery with a dangerous weapon of Phillip Holder. Defendant was sentenced to death for the first-degree murders. We find no error in defendant's convictions or sentences.

## PROCEDURAL BACKGROUND

The Henderson County Grand Jury returned a true bill of indictment on 21 January 2003 charging defendant with robbery with a dangerous weapon and two superseding true bills of indictment on 17 March 2003 charging defendant with the first-degree murders of Phillip and Pamela Holder. Defendant was tried capitally, and on 6 September 2005 the jury returned verdicts of guilty on all counts. Following the required penalty proceeding, the jury made binding recommendations on 9 September 2005 that defendant be sentenced to death for each murder. The trial court entered judgment accordingly. The trial court also sentenced defendant to 100 to 129 months of active incarceration for the robbery with a dangerous weapon conviction. Defendant appeals the judgments of the trial court pursuant to N.C.G.S. § 7A-27(a).

---

1. Throughout the record Phillip Holder's name appears interchangeably as "Phillip" and "Philip."

**STATE v. RAINES**

[362 N.C. 1 (2007)]

## FACTUAL BACKGROUND

Defendant first met Phillip Holder when defendant was approximately twelve years old. Defendant's father had recently died, and defendant's mother had demonstrated an inability or unwillingness to provide proper care for defendant and his siblings. After Phillip met defendant, he realized that defendant needed care and invited defendant over to the Holder residence. Eventually, the Holders encouraged defendant to live with them when defendant was a teenager. Defendant's mother told Patricia Holder, Phillip's mother, that defendant "can stay, and I don't care how long he stays."

Once defendant began living with the Holders, his life improved and he was hopeful about his future. Patricia cut defendant's hair and bought him clothes and shoes, and he began attending church with the family. Defendant and Phillip remained close friends throughout high school. Following defendant's graduation from high school, he abused alcohol, amphetamines, marijuana, and crack cocaine. From 1996 to 2001 defendant was convicted on seven different occasions of various offenses, including larceny and felony escape from prison. Following defendant's release from prison in July 2002, he resided with Phillip and his wife, Pamela Holder.

## The Crimes

On 10 December 2002, Pamela gave defendant her credit card to purchase medication. However, instead of using it to purchase medication defendant and Heath Rice attempted to use the card very early the next morning to purchase consumer electronics at Wal-Mart. Defendant intended to sell or trade these items in order to obtain cocaine. Asheville Police Officer Scott Early, who was also employed in a security guard capacity at Wal-Mart, telephoned Pamela to inquire whether defendant was authorized to use the card. Pamela and Phillip explained to Early that defendant was authorized to use the card to purchase medication, but not consumer electronics. Phillip informed Early that he did not want to prosecute defendant but rather asked Early to hold defendant until they could arrive at Wal-Mart. At approximately 3:30 a.m. on 11 December 2002, Phillip and Pamela arrived at Wal-Mart, picked up defendant, and departed. Defendant rode in Phillip's vehicle, and Pamela drove her vehicle separately.

At the State's request, defendant later related the events which transpired after they left Wal-Mart to Dr. Heidi Katrina Coppotelli, a licensed clinical psychologist. Defendant stated that Phillip was furi-

STATE v. RAINES

[362 N.C. 1 (2007)]

ous as they drove from Wal-Mart to the Holder residence. On the way home Phillip ran two blinking red lights in order to prevent defendant from jumping out of the vehicle. When they arrived at the residence, Phillip gave defendant a sleeping bag and instructed him to sleep in the shed and not in the family home. Defendant had already smoked a significant amount of crack cocaine that day and, after being sent to the shed, he smoked another couple of rocks of crack cocaine. Defendant stated that after smoking these rocks, he went "crazy" for more. He grabbed a wrench and went to the Holders' door to ask whether he could use the restroom. The Holders allowed him into their home, and upon leaving the restroom defendant immediately struck Phillip in the head with the wrench and then hit Pamela. Defendant struck Pamela and Phillip several more times before retrieving firearms from the victims' bedroom. Defendant considered tying them up and attempting to obtain money for crack cocaine, but instead he shot each victim several times, killing them. When asked why he shot Phillip, defendant said it was "just better to kill him." Defendant then stole money and several of Phillip's firearms and left in Phillip's truck without changing clothes.

Later in the day, Phillip's sister Jill Gilbert, along with her teenage son Austin, went to the victims' residence. Upon arrival, Gilbert and her son walked around the residence, peeking in the windows to observe whether anything was wrong because they had been unable to make contact with the victims that day. They observed ammunition strewn on the victims' son's bed, which they considered strange, given Phillip's usual tidiness. Eventually, Austin was able to gain entrance into the residence through a window. Austin found the bodies of Phillip and Pamela and then opened the front door to allow his mother to see inside, after which both of them waited outside for law enforcement to arrive.

Deputies from the Henderson County Sheriff's Office arrived at the scene and determined that a number of firearms had been removed from the residence, and that the victims' credit cards were also missing. The State's evidence described defendant's movement throughout the rest of the day. Defendant took Phillip's truck, drove to a convenience store, and unsuccessfully attempted to cash a check drawn on Phillip's account. Defendant then traveled to Asheville Auto Sales where he sold Phillip's camper cover to William Hyatt for twenty dollars. Hyatt also bought twelve to thirteen firearms from defendant, and it was later determined that all of the purchased firearms belonged to Phillip Holder.

Eventually, Sergeant Richard Lane of the Greenville County (South Carolina) Sheriff's Office was dispatched to respond to a call about a parked truck, which, because of recent publicity, the caller believed might have been involved in the murders. When Sergeant Lane arrived at the scene, he found defendant in the truck and took him into custody without incident.

Donald Jason, M.D., a physician, pathologist, and associate professor of pathology at Wake Forest University School of Medicine, performed autopsies on both Pamela and Phillip. Phillip had six linear blunt force wounds to his head that lacerated his scalp, some of which fractured his skull. He also had a gunshot wound above and between his eyes and a second gunshot wound to the back of the head. Projectiles from both of these gunshots entered his brain. A third gunshot wound was present on the palm of his hand near the base of his thumb. Dr. Jason was unable to conclude whether blunt force trauma standing alone would have caused Phillip's death, but opined that either or both gunshot wounds to the head would have been fatal. Pamela had four linear blunt force wounds on her head, but no skull fractures. She had been shot twice, once in the back of the head with the bullet eventually entering her brain and once in her right shoulder. Both gunshots were consistent with her being shot while she was seated. Dr. Jason opined that the gunshot wound to the brain was the cause of death.

Defendant presented evidence in the form of testimony from Dr. Coppotelli. Dr. Coppotelli had reviewed materials prepared by Debra Gray, a social worker, and had interviewed defendant at the State's request. Based upon her analysis, Dr. Coppotelli opined that defendant suffered from moderate depression and that when he decided to rob the Holders he had chosen to give in to his denied frustration of anger, his habitual denial of reality, and his indulgence of blaming his misery on others. She testified that defendant had an attachment disorder and a deep-seated fear of abandonment and that these issues triggered his explosive anger at the time of the murders.

After deliberating upon these facts, the jury returned verdicts of guilty of two counts of first-degree murder and one count of robbery with a dangerous weapon. The trial court then advanced to the penalty proceeding as required by statute.

## Penalty Proceeding Evidence

At the penalty proceeding, the State presented victim impact evidence from various family members of the victims, including

Pamela's sister, Phillip's sister, and Phillip's mother. The State also presented evidence from Captain Charles McDonald of the Henderson County Sheriff's Office Detention Center, who testified concerning defendant's behavior while awaiting trial.

Defendant presented evidence from various witnesses concerning his childhood experiences of physical and verbal abuse. Additionally, defendant presented evidence that he had been assigned to classes for behaviorally and emotionally challenged students and that he had performed poorly in school until he began residing with the Holders. William Beal, a prison minister, testified that defendant began studying his Bible and expressed "hurt" for what had happened.

The jury found as aggravating circumstances in both murders that the murder was committed while defendant was committing or attempting to commit robbery, that the murder was committed for pecuniary gain, and that the murder was part of a course of conduct in which defendant committed other crimes of violence against other persons. Additionally, the jury found that the murder of Phillip Holder was especially heinous, atrocious, or cruel. One or more jurors found the statutory mitigating circumstances in both murders that defendant committed the murder under the influence of mental or emotional disturbance and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. One or more jurors also found ten nonstatutory mitigating circumstances to exist. After finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty when considered with the mitigating circumstances, the jury returned binding recommendations of death, and the trial court entered judgment according to those recommendations.

## ANALYSIS

### Pretrial Matters

Defendant and the State request that this Court review the personnel file of Lieutenant Jerry Rice of the Henderson County Sheriff's Office pursuant to *State v. Hardy*, 293 N.C. 105, 128, 235 S.E.2d 828, 842 (1977) and *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Lieutenant Rice's personnel file is under seal as directed by the trial court. This Court has reviewed Lt. Rice's personnel file and determined that there is nothing of exculpatory value contained

therein to which defendant would be entitled. Defendant's assignment of error is overruled.

## Jury Selection Issues

[1] Defendant asserts the trial court erred in failing to *sua sponte* declare a mistrial or, in the alternative, dismiss all prospective jurors who heard another prospective juror comment that he had read about the murders in the newspaper and that what he had read "sounded pretty incriminating." After discovering that the prospective juror had read about the murders in the newspaper, the trial court asked the prospective juror whether he could put aside "whatever [he] had read and decide the case based on the evidence that's presented" in the trial, to which the prospective juror responded, "I think I could." Defendant contends that this case is similar to *State v. Gregory*, 342 N.C. 580, 467 S.E.2d 28 (1996). In *Gregory*, this Court found defendant was denied a fair trial because a prospective juror stated during *voir dire* that she had worked with a lawyer who had previously represented the defendant in the case currently before the trial court, and as a result of that employment, she was privy to confidential information that was helpful to the State and this information might influence her decision. *Id.* at 582-83, 467 S.E.2d at 30-31. The instant case is distinguishable. First, the information about which the prospective juror was speaking was not confidential, but was publically disseminated. Nothing in the prospective juror's statement would lead other jurors to speculate as to any secret knowledge he may have had. Additionally, the prospective juror indicated that he would follow the trial court's instructions and only consider evidence properly admitted at trial.[2] Defendant has failed to meet his burden of showing that he was prejudiced by the trial court's failure to *sua sponte* order a mistrial or excuse the prospective jurors present during the complained-of *voir dire*. Accordingly, this assignment of error is overruled.

[2] Defendant assigns multiple instances of error concerning the trial court's limiting of his *voir dire* questioning of prospective jurors during jury selection. "This Court has previously stated that '[i]n this jurisdiction counsel's exercise of the right to inquire into the fitness of jurors is subject to the trial judge's close supervision. The regulation of the manner and the extent of the inquiry rests largely in the trial judge's discretion.' " *State v. Elliott*, 360 N.C. 400, 409, 628 S.E.2d

---

2. The prospective juror was later excused because of his statement that he would not condemn someone to death. Therefore, the issue, as in *Gregory*, is whether defendant was prejudiced by the other jurors' exposure to the statements at issue.

735, 742 (quoting *State v. Bryant*, 282 N.C. 92, 96, 191 S.E.2d 745, 748 (1972) (alteration in original), *cert. denied*, 410 U.S. 958 (1973), and *cert. denied*, 410 U.S. 987 (1973)), *cert. denied*, —— U.S. ——, 127 S. Ct. 505, 166 L. Ed. 2d 378 (2006). Defendant asserts that he was not allowed to question certain jurors concerning whether they could consider certain types of mitigating evidence. Even assuming, *arguendo*, that defendant could demonstrate that the trial court abused its discretion, defendant cannot show prejudice as he did not exhaust his peremptory challenges. *See State v. Neal*, 346 N.C. 608, 618, 487 S.E.2d 734, 740-41 (1997) (defendant cannot show prejudice unless he has exhausted all peremptory challenges (citing *State v. Mash*, 328 N.C. 61, 64, 399 S.E.2d 307, 310 (1991))), *cert. denied*, 522 U.S. 1125 (1998). Consequently, these assignments of error are overruled.

## Guilt-Innocence Phase Issues

### *Evidentiary Issues*

[3] Defendant contends that the trial court committed plain error in failing to intervene *sua sponte* during certain portions of guilt-innocence phase testimony. Specifically, defendant argues the trial court should have intervened when Rhonda Whitaker, Pamela's sister, testified about how a member of the Sheriff's Office notified her of her sister's murder and about the reaction of Pamela's mother after being informed of her daughter's death, and when Patricia Holder testified about the reaction of the victims' son to the death of his parents. Because defendant failed to timely object to these statements, we review them only for plain error. Defendant has failed to meet his burden of showing that the statements were unduly prejudicial.

Generally, "character evidence of a victim is usually irrelevant during the guilt-innocence portion of a capital trial, as is victim-impact evidence." *State v. Maske*, 358 N.C. 40, 50, 591 S.E.2d 521, 528 (2004) (citing *State v. Abraham*, 338 N.C. 315, 352-53, 451 S.E.2d 131, 151 (1994) and *State v. Oliver*, 309 N.C. 326, 360, 307 S.E.2d 304, 326 (1983)). Because the evidence of defendant's guilt of first-degree murder was overwhelming, we cannot conclude that the jury would have reached a different verdict had the trial court excluded *sua sponte* Rhonda Whitaker's testimony concerning how she discovered her sister's death and her mother's reaction to the news.

[4] As to the testimony of Patricia Holder, she was answering a line of questioning propounded by defendant, and therefore any error as

to her testimony was invited. *See* N.C.G.S. § 15A-1443(c) (2005) ("A defendant is not prejudiced . . . by error resulting from his own conduct."); *State v. Jennings*, 333 N.C. 579, 604, 430 S.E.2d 188, 200 (defendant may not invalidate a trial by introducing evidence on cross-examination otherwise inadmissible on direct examination (citing *State v. Greene*, 324 N.C. 1, 12, 376 S.E.2d 430, 438 (1989), *judgment vacated on other grounds*, 494 U.S. 1022 (1990))), *cert. denied*, 510 U.S. 1028 (1993). Even had this not been invited error, its exclusion certainly would not have changed the result of the trial. These assignments of error are therefore overruled.

### Closing Argument Issues

[5] Defendant asserts that the trial court abused its discretion in overruling his objection to a portion of the prosecution's closing argument during the guilt-innocence phase when the prosecutor argued, "And I appreciate them coming in here and saying, well, okay, we did it. Well, we wouldn't have if we didn't have that evidence. We would be in here with him saying I didn't do it."

This Court has set out a two-part analysis for determining whether the trial court abused its discretion in overruling a defendant's objection in such cases: "[T]his Court first determines if the remarks were improper. . . . Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *See State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002) (citing *Coble v. Coble*, 79 N.C. 439, 79 N.C. 589 (1878)).

The State argues that the statement made by the prosecutor was not improper because he was merely expounding upon defense counsel's statement during closing arguments that he would like to "stand up here and say find him not guilty. But I'm not doing that." Defendant asserts that the argument made by the prosecutor was a personal attack that called into question the integrity and professionalism of the defense attorneys. Even assuming *arguendo* that the prosecutor's statements were improper, we conclude that such statements were not unfairly prejudicial to defendant.

This case is somewhat analogous to *State v. Rivera*, 350 N.C. 285, 514 S.E.2d 720 (1999). In *Rivera*, the prosecution told the jury that defense counsel "displayed one of the best poker faces as we introduced [a witness] in the history of this courthouse." *Id.* at 290-91, 514 S.E.2d at 723. After this Court voiced its displeasure with the state-

ment, it wrote: "Although the comment of the prosecutor in this case *was not extreme,* it did not meet the standard of 'dignity and propriety' required of all trial counsel by Rule 12 of the General Rules of Practice for the Superior and District Courts." *Id.* at 291, 514 S.E.2d at 723 (emphasis added).

Similar to *Rivera,* the prosecutor's comment in this case was neither appropriate nor laudable, but it was not extreme. Considering the overwhelming amount of evidence presented by the prosecution that defendant was guilty of first-degree murder, and given that the prosecutor's comment is confounding as to its true meaning, we conclude the trial court did not abuse its discretion in overruling defendant's objection. This assignment of error is overruled.

[6] Defendant also contends the trial court erred by failing to intervene *ex mero motu* during guilt-innocence phase closing arguments when a prosecutor stated:

> And then there's [sic] these things that the Judge will tell you that you may consider in deciding whether or not he acted in deliberate fashion. Lack of provocation by the victim. Now, what is provocation? The Defense would have you believe that when Philip Raines [sic] said, you're out of here, you're not staying here anymore, that that was provocation.
>
> Well, again, members of the jury. I hope that's not the case and that we're not going to set that sort of precedent here. Because the next guy that gets fired out there is going to say, oops, provocation, I'm going to kill the boss. You know? Hearing something you don't like is not provocation and an excuse to kill or a way to avoid a first degree murder charge. It just simply isn't.

Defendant did not make a timely objection.

In *State v. Allen,* this Court explained review of allegedly improper remarks that do not draw a defendant's objection:

> In a hotly contested trial, such as a capital case, "[t]he scope of jury arguments is left largely to the control and discretion of the trial court, and trial counsel will be granted wide latitude." *State v. Call,* 349 N.C. 382, 419, 508 S.E.2d 496, 519 (1998). Counsel may argue any facts in the record and any reasonable inference that may be drawn from any facts in the record. *See id.* Here, defendant did not object to any statements now complained of during the arguments before the trial court and now

argues the trial court should have intervened *ex mero motu*. However, we will not find error in a trial court's failure to intervene in closing arguments *ex mero motu* unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair. *Id.* at 419-20, 508 S.E.2d at 519.

360 N.C. 297, 306-07, 626 S.E.2d 271, 280 (alteration in original), *cert. denied,* —— U.S. ——, 127 S. Ct. 164, 166 L. Ed. 2d 116 (2006).

We determine that the prosecutor's statement was not "so grossly improper [as to] render[] the trial and conviction fundamentally unfair." *Id.* It appears from the record that the prosecution was attempting to apply the law to this case, rather than making an improper statement of the law and, contrary to defendant's assertion, the prosecutor was not encouraging jury nullification of North Carolina law on provocation. In the broader context of the prosecutor's argument, he was simply encouraging the jury to find defendant guilty · of first-degree murder rather than second-degree murder because Phillip's insistence that defendant could not sleep in the house did not amount to sufficient provocation. Moreover, the trial court instructed the jury that it was necessary to "understand and apply the law as I give it to you," after which the trial court properly instructed the jury on the elements of first-degree and second-degree murder. This assignment of error is overruled.

### Jury Form Issue

[7] Defendant contends the trial court erred in submitting a verdict form to the jury which stated in part:

WE, THE MEMBERS OF THE JURY RETURN THE UNANIMOUS VERDICT AS FOLLOWS:

_____ GUILTY OF FIRST DEGREE MURDER OF [VICTIM]

IF YOU ANSWER "YES", IS IT: (You should answer both, and you may answer "yes" to either or both)

_____ A. PREMEDITATION AND DELIBERATION?

_____ B. UNDER THE FIRST DEGREE FELONY MURDER RULE?

Defendant asserts that this verdict form violated his constitutional rights as it suggested to the jurors that they were expected to find defendant guilty of first-degree murder when it told them, "You should answer both, and you may answer 'yes' to either or both" the-

ories for first-degree murder. This argument is without merit, as the verdict form was not improper or misleading. There is no indication that the jury would have been confused. It was instructed to answer under what theory it convicted defendant of first-degree murder only if it found defendant guilty of first-degree murder. Additionally, the verdict form included other options: guilty of second-degree murder and not guilty. The verdict form correctly stated that the jury must have found defendant guilty of either deliberate and premeditated murder or of felony murder to properly convict him of first-degree murder. As worded, this form did not nullify the other options available to the jury. This assignment of error is overruled.

## Penalty Proceeding Issues

### *Evidentiary Issues*

[8] Defendant asserts that the trial court erred in overruling his objection to Jill Gilbert's testimony concerning defendant's childhood. Ms. Gilbert, Phillip's sister, testified that "I don't think that anything that relates back to his childhood could have made something this—this horrible—[.]" Defendant objected to this statement, and the trial court overruled the objection.

> Victim impact statements are relevant and admissible to aid the jury in its decision whether to recommend a sentence of death. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991). North Carolina law allows victim impact testimony by statute. *See* N.C.G.S. § 15A-833 (2005); *State v. Roache*, 358 N.C. 243, 314-15, 595 S.E.2d 381, 426-27 (2004). The admissibility of victim impact testimony is limited by the requirement that the evidence not be so prejudicial it renders the proceeding fundamentally unfair. *See State v. Nicholson*, 355 N.C. 1, 38-40, 558 S.E.2d 109, 135-36, *cert. denied*, 537 U.S. 845 (2002).

*Allen*, 360 N.C. at 310, 626 S.E.2d at 282. Victim impact testimony is admissible to show the effect the victim's death had on friends and family members; however, the victim's family members' and friends' "characterizations and opinions about the crime, the defendant, and the appropriate sentence" are inappropriate. *See Payne*, 501 U.S. at 830 n.2. We are not persuaded that Jill Gilbert's incomplete sentence was so prejudicial it rendered the proceeding fundamentally unfair. After defendant's objection, Ms. Gilbert did not complete her thought or even her sentence. Instead, she continued to talk about other matters of which defendant does not complain. The jury did not hear Ms.

Gilbert's complete thought, nor will this Court speculate whether Ms. Gilbert was attempting to ask the jurors to give little weight to defendant's mitigating evidence. This assignment of error is overruled.

[9] Defendant further contends that the trial court committed plain error in violation of his state and federal constitutional rights when it admitted evidence from Captain Charles McDonald of the Henderson County Sheriff's Office Detention Center. Defendant argues that this testimony violated his Confrontation Clause rights and his right to free speech. Because defendant failed to object on these grounds at trial, we consider only whether the trial court committed plain error. *See* N.C. R. App. P. 10(c)(4).

"A reversal for plain error is only appropriate in the most exceptional cases." *State v. Duke*, 360 N.C. 110, 138, 623 S.E.2d 11, 29 (2005), *cert. denied*, —— U.S. ——, 127 S. Ct. 130, 166 L. Ed. 2d 96 (2006). Indeed,

> [b]efore deciding that an error by the trial court amounts to "plain error," the appellate court must be convinced that absent the error the jury probably would have reached a different verdict. In other words, the appellate court must determine that the error in question "tilted the scales" and caused the jury to reach its verdict convicting the defendant. Therefore, the test for "plain error" places a much heavier burden upon the defendant than that imposed by N.C.G.S. § 15A-1443 upon defendants who have preserved their rights by timely objection. This is so in part at least because the defendant could have prevented any error by making a timely objection. *Cf.* N.C.G.S. § 15A-1443(c) (defendant not prejudiced by error resulting from his own conduct).

*State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83-84 (1986) (internal citations omitted). With *Walker's* standard guiding our decision, we hold that the trial court did not commit plain error in admitting this evidence because its admission was not erroneous.

We turn first to defendant's argument that the testimony of Captain McDonald violated his Confrontation Clause rights. Defendant contends that when McDonald read from various detention center incident reports, he interjected "testimonial" statements which should have been excluded under *Crawford v. Washington*, 541 U.S. 36 (2004). The detention center incident reports at issue have little, if any, relation to testimonial evidence. Instead, these reports are more like business records, which "by their nature [are]

not testimonial." *Id.* at 56. It is not necessary that the detention center incident reports meet every requirement of an admissible business record under Rule of Evidence 803(6) because the Rules of Evidence are not controlling in a capital penalty proceeding. *See State v. Rose*, 339 N.C. 172, 200-01, 451 S.E.2d 211, 227-28 (1994), *cert. denied*, 515 U.S. 1135 (1995). However, use of the Rules is helpful in determining whether the statement has sufficient indicia of reliability. Rule 803(6) provides that the hearsay rule does not exclude records of regularly conducted activity, which are defined as:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

N.C.G.S. § 8C-1, Rule 803(6) (2005).

McDonald testified that he was in charge of the facilities at the detention center, that he was familiar with the record keeping policies, that he frequently viewed incident reports, that it was policy for an incident report to be prepared after each incident, and that disciplinary action is to be documented when it occurs. There is no indication in the record that the reports were prepared for use in later legal proceedings. Instead, the record indicates that these reports were created as internal documents concerning administration of the detention center. The statements contained in the report from detention officers and other inmates were not taken in such a manner as to be testimonial or to be used during later criminal proceedings. The detention center incident reports are not testimonial in nature, nor are the statements contained therein testimonial. As a result, their admission did not violate defendant's Confrontation Clause rights or the analogous rights under the North Carolina Constitution.

**[10]** Second, defendant contends that because one of these reports indicated that defendant called another inmate by a racial epithet, its

admission violated his rights under the First Amendment to the United States Constitution. Defendant asserts that this evidence was not relevant to any issue in the capital sentencing proceeding as both the victims were of the same race as defendant, and therefore admission of the evidence was improper under *Dawson v. Delaware*, 503 U.S. 159 (1992). We disagree. In *Dawson*, the Supreme Court of the United States noted that the defendant's membership in the Aryan Brotherhood, a white supremacist organization, was irrelevant to his crime as it did not involve race. *Id.* at 166. The instant case is clearly distinguishable. The report indicated that the racial epithet was used when defendant was holding a mop handle in the air and cursing at another inmate. This context and the inflammatory nature of the word used by defendant were relevant to rebut the submitted mitigating circumstance that "defendant has demonstrated an ability to adapt to prison life." Accordingly, the evidence was relevant and admissible. Because admission of these detention center reports was not erroneous, defendant cannot show plain error.

[11] Defendant additionally contends that his counsel was ineffective for failing to object on these constitutional grounds at trial. Because we hold that the evidence complained of was admissible even if defense counsel had objected, we reject defendant's claim of ineffective assistance of counsel as defendant cannot show prejudice. *See Strickland v. Washington*, 466 U.S. 668, 693 (1984) (defendant must show deficient representation and prejudice to prevail on an ineffective assistance of counsel claim). We overrule these assignments of error.

[12] Defendant contends that the trial court committed reversible error in not permitting him to introduce evidence during the sentencing proceeding that he was sexually abused by his father. Defendant had sought to introduce evidence from Debra Gray, a clinical social worker retained by the defense to prepare defendant's psychosocial history. Defense counsel submitted a proffer to the trial court, outside the presence of the jury, that Ms. Gray would testify concerning an "interview that Ms. Gray did with [defendant's sister] who related to her that she knows [the sexual abuse] happened to [defendant], that she saw it." We note initially that defendant did not raise any constitutional issue during trial in regards to the admission of this evidence. Accordingly, we will not consider the merits of defendant's constitutional arguments. *See* N.C. R. App. P. 10(b)(1); *see also State v. Benson*, 323 N.C. 318, 321-22, 372 S.E.2d 517, 519 (1988).

STATE v. RAINES

[362 N.C. 1 (2007)]

Moreover, while the Rules of Evidence only serve as guidelines in capital penalty proceedings, the trial court may properly exclude hearsay statements which lack sufficient indicia of reliability or lack a proper foundation. *See Rose*, 339 N.C. at 200-01, 451 S.E.2d at 227. In sustaining the prosecution's objection to admission of evidence of the alleged abuse, the trial court considered that defendant had denied that any such sexual abuse had taken place and that the declarant was available to testify. We cannot say that the trial court erred in determining that the proposed hearsay statements lacked sufficient indicia of reliability. Defendant's assignment of error is thus overruled.

[13] Defendant contends that the trial court violated his federal and state constitutional rights by prohibiting the defense from presenting evidence concerning the chaotic and abusive nature of defendant's family unless defense counsel could establish that each incident directly affected defendant in some way. We note initially that defendant was allowed to present substantial evidence concerning his childhood and that of his siblings at both the guilt-innocence phase and penalty proceedings. Proposed mitigating evidence is relevant when it "sheds light on defendant's age, character, education, environment, habits, mentality, propensities, or criminal record, or on the circumstances of the offense for which defendant was being sentenced." *State v. Locklear*, 349 N.C. 118, 159, 505 S.E.2d 277, 301 (1998), *cert. denied*, 526 U.S. 1075 (1999).

Our review of the record indicates that the trial court did not exclude evidence of defendant's environment, but insisted that defendant's witness first explain the factual basis for her conclusion that defendant grew up in an injurious environment. The trial court instructed defense counsel that the evidence which led to these conclusions would have to be somehow "tied back to" defendant. We cannot say the trial court erred in requiring defense counsel to lay the proper foundation to establish that the evidence was relevant and not merely a recital of "feelings, actions, and conduct of third parties [which] have no mitigating value as to defendant and are irrelevant in capital sentencing proceedings." *State v. Smith*, 359 N.C. 199, 214-15, 607 S.E.2d 607, 619 (citing *Locklear*, 349 N.C. at 160-61, 505 S.E.2d at 302), *cert. denied*, 546 U.S. 850 (2005).

Specifically, defendant asserts that the trial court erred in prohibiting defense witnesses from testifying about the arrest of defendant's father for allegedly sexually abusing defendant's sister. We cannot discern from the record what the testimony of the witnesses

would have been had the trial court not sustained the prosecution's objection. In such cases the law is well settled:

> [I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record. We also held that the essential content or substance of the witness' testimony must be shown before we can ascertain whether prejudicial error occurred.

*State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985) (citing *Currence v. Hardin*, 296 N.C. 95, 249 S.E.2d 387 (1978)). In both situations complained of by defendant, the trial court allowed the witness to testify that defendant's father had been arrested when defendant was a child. However, when defense counsel asked each witness why defendant's father had been arrested, the trial court sustained the prosecution's objection. Defense counsel then proceeded to other questions without making an offer of proof or requesting that the witness be allowed to answer outside the presence of the jury. We will not engage in speculation as to the answers each witness would have provided. These assignments of error are overruled.

### Closing Argument Issues

[14] Defendant next argues that the trial court erred in failing to intervene *ex mero motu* during penalty proceeding closing arguments when the prosecutor created a scenario of the crime which defendant asserts could not reasonably be inferred from the evidence. One prosecutor argued that Phillip Holder was conscious, begged for his life, and attempted to reason with defendant before defendant killed his wife and him. This same prosecutor asked concerning Pamela Holder: "Do you think she begged for her life?" Another prosecutor argued that defendant often blames other people for his plights and suggested that defendant was probably blaming the prosecutor right now for "trying to give me the death penalty." Defendant failed to enter a timely objection to any of these remarks.

"Prosecutors may create a scenario of the crime committed as long as the record contains sufficient evidence from which the scenario is reasonably inferable." *State v. Bishop*, 343 N.C. 518, 543, 472 S.E.2d 842, 855 (1996) (citing *State v. Ingle*, 336 N.C. 617, 645, 445 S.E.2d 880, 895 (1994), *cert. denied*, 514 U.S. 1020 (1995)), *cert. denied*, 519 U.S. 1097 (1997). "[T]his Court has repeatedly found no

impropriety when the prosecutor asks the jury to imagine the fear and emotions of a victim." *State v. Warren*, 348 N.C. 80, 109, 499 S.E.2d 431, 447 (citations omitted), *cert. denied*, 525 U.S. 915 (1998).

Here, it was reasonable to infer from the evidence that the Holders may have pleaded for their lives. Pamela was found in a recliner, slumped with her buttocks on the edge of the chair and her legs straight out. Her hair and arm were across her face. Dr. Jason testified that she may or may not have been unconscious after being struck with the wrench. It was reasonable to infer that Pamela saw defendant approaching with the firearm and raised her arm over her face in a defensive manner. It was also reasonable to infer that she would have asked that her life be spared. Dr. Jason testified that Phillip was beaten with the wrench before being shot. It was reasonable to infer that Phillip was conscious before being shot, as Dr. Jason testified that Phillip's palm had a defensive gunshot wound and that blood found on Phillip's jeans indicated that he was upright for a significant period of time after he began bleeding. It would only be natural that a conscious Phillip would have asked that their lives be spared.

Moreover, the remark by a prosecutor that defendant might have been blaming that prosecutor for "trying to give me the death penalty," which was couched in a series of arguments that no one but defendant was to blame for his predicament, was so innocuous that it does not even come near the level of gross impropriety. It appears from the record that the prosecutor was simply arguing to jurors that they should feel no guilt or blame if they were to find that defendant's crimes were worthy of death. *See State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41 (stating that the prosecutor's duty is "to strenuously pursue the goal of persuading the jury that the facts of the particular case at hand warrant imposition of the death penalty" (citing *State v. Myers*, 299 N.C. 671, 680, 263 S.E.2d 768, 774 (1980))), *cert. denied*, 513 U.S. 1046 (1994).

While the prosecution's comments concerning the final moments of the victims' lives may have neared the edge of the latitude given counsel during closing arguments to make inferences from the evidence, we cannot say that the remarks were grossly improper so as to require the trial court to intervene *ex mero motu*. *See State v. Cummings*, 352 N.C. 600, 621-22, 536 S.E.2d 36, 52 (2000), *cert. denied*, 532 U.S. 997 (2001). Additionally, the trial court instructed jurors that "if your recollection differs from that of the Court or the lawyers, you are to rely solely upon your own recol-

lection of the evidence during your deliberations." These assignments of error are overruled.

[15] Defendant also asserts that the trial court erred in failing to intervene *ex mero motu* when a prosecutor argued during penalty proceeding closing arguments that many of the mitigating circumstances submitted by defendant had no connection to the crime. However, defendant's argument fails to take into account the prosecutor's complete statement. The prosecutor was not telling the jury that the mitigators must have a nexus to the crime. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (stating that certain mental capacity evidence need not find a nexus to the crime to be relevant mitigating evidence). Instead, the prosecutor argued: "Where is the connection? Why does it make what he did to Philip and Pam Holder less deserving of the ultimate penalty? We are here to talk about and deal with what happened on December the 11th, 2002." Taken in context, it is clear that the prosecutor was not arguing that the mitigating evidence must be connected to the crime, but that the evidence did not have mitigating value in that it did not make defendant "less deserving of the ultimate penalty." This Court has stated that "prosecutors may legitimately attempt to deprecate or belittle the significance of mitigating circumstances." *State v. Basden*, 339 N.C. 288, 305, 451 S.E.2d 238, 247 (1994), *cert. denied*, 515 U.S. 1152 (1995). The prosecutor's remarks were not improper, and thus, the trial court did not err in failing to intervene *ex mero motu*. This assignment of error is overruled.

### Jury Instruction Issues

[16] Defendant assigns error to the trial court's failure to submit a peremptory instruction on the N.C.G.S. § 15A-2000(f)(2) mitigating circumstance of whether defendant "was under the influence of mental or emotional disturbance" at the time of the murders.

> It is well established a defendant is entitled to peremptory instructions on a mitigating circumstance.whenever the evidence supporting the mitigating circumstance is uncontroverted. *See State v. Holden*, 338 N.C. 394, 402-03, 450 S.E.2d 878, 882 (1994). "[W]e have held that it is not error for a trial court in a capital case to refuse to give requested instructions where counsel failed to submit the instructions to the trial court in writing." *State v. White*, 349 N.C. 535, 570, 508 S.E.2d 253, 275 (1998)[, cert. denied, 527 U.S. 1026 (1999)].

*Duke,* 360 N.C. at 131, 623 S.E.2d at 25 (first alteration in original). Neither party has pointed us to, nor can we find in the record, defendant's written request for such an instruction. However, even if defendant had submitted the proposed instruction to the trial court, he would not have been entitled to such an instruction. The evidence was not uncontroverted that defendant acted "under the influence of mental or emotional disturbance" at the time of the crime. While there was sufficient evidence for the jury to so find, there was also evidence that showed defendant created a ruse to enter the Holder residence and had the mental capacity at the time of the murders to steal various items of personal property from the residence to sell. The evidence here was not conclusive and incontrovertible, and jurors could have been justified in rejecting the mitigator, as the evidence could have been taken to show deliberation as opposed to the actions of an emotionally disturbed person. This assignment of error is overruled.

**[17]** Defendant contends the trial court erred in submitting the pecuniary gain aggravating circumstance in addition to the aggravating circumstance that the murder was committed during the commission of a robbery. N.C.G.S. § 15A-2000(e)(5), (6) (2005). Generally speaking, "in cases of premeditated murder in which there was also a robbery with a dangerous weapon with an underlying motive of pecuniary gain, it is only permissible to submit either the (e)(5) or (e)(6) aggravating circumstance, as 'one plainly comprises the other.' " *State v. Cummings,* 361 N.C. 438, 467, 648 S.E.2d 788, 805 (2007) (quoting *State v. Quesinberry,* 319 N.C. 228, 238, 354 S.E.2d 446, 452 (1987), *judgment vacated on other grounds,* 494 U.S. 1022 (1990)). However, this is not the case when there is separate evidence that tends to prove both aggravators. *See State v. East,* 345 N.C. 535, 553-54, 481 S.E.2d 652, 664-65, *cert. denied,* 522 U.S. 918 (1997). In the instant case, the trial court instructed the jury to consider only the theft of the firearms, credit cards, and checks in determining whether the (e)(6) pecuniary gain circumstance was present and to not consider the vehicle theft in making that determination. As to the (e)(5) aggravator, the trial court instructed the jury to consider only the evidence related to the theft of the truck. The trial court properly submitted both aggravating circumstances to the jury. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant argues that: (1) the short-form murder indictment was insufficient to charge him with first-degree murder in that it failed to

allege all the elements of first-degree murder; (2) the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally overbroad and vague; (3) the trial court erred in instructing the jury to answer "yes" for Issue Three of the Issues and Recommendations as to Punishment Form even if the weight of the mitigating and aggravating circumstances were of equal weight; (4) the trial court erred in instructing the jury to refuse to give effect to nonstatutory mitigating circumstances if the jurors found them to have no mitigating value; (5) the trial court erred in instructing the jury that it was the defendant's burden to "satisfy" the jurors of the existence of mitigating circumstances; (6) the trial court erred in instructing the jurors that in considering Issues Three and Four of the Issues and Recommendations as to Punishment Form, they "may" consider the mitigating circumstances found in response to Issue Two; and (7) the death penalty is inherently cruel and unusual, and North Carolina's sentencing procedure is unconstitutionally vague and overbroad. We have considered all of defendant's arguments and decline to overrule our prior precedent holding these arguments to be without merit. *See Duke*, 360 N.C. at 136-42, 623 S.E.2d at 28-32.

## PROPORTIONALITY

[18] As we have concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we now consider: (1) whether the record supports the aggravating circumstances found by the jury and upon which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the facts of the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (2005).

The jury found three aggravating circumstances as to defendant's murder of Pamela Holder: (1) the murder was committed while defendant was committing or attempting to commit robbery, N.C.G.S. § 15A-2000(e)(5); (2) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (3) the murder was part of a course of conduct in which defendant engaged and that course of conduct included the commission by defendant of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11) (2005). In addition to the three aggravating circumstances found as to the murder of Pamela, jurors also found that Phillip's murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (2005).

STATE v. RAINES

[362 N.C. 1 (2007)]

The record indicates that defendant stole various items from the Holder residence, including firearms and credit cards. This is sufficient to support the (e)(6) aggravating circumstance. The record also shows that defendant stole Phillip's truck immediately after committing the murders. This is sufficient to support the (e)(5) aggravating circumstance. Moreover, sufficient evidence showed that defendant's actions in murdering each victim were part of the course of conduct which resulted in other crimes of violence to another person—the other victim. This is sufficient to satisfy the (e)(11) aggravating circumstance. There is also sufficient evidence to support the (e)(9) aggravating circumstance as to the murder of Phillip Holder. Defendant brutally beat Phillip with a wrench and then shot him three times because it was "just better to kill him."

There is no indication in the record that the jury was under the influence of passion, prejudice, or any other arbitrary factor in determining defendant's sentence. In such circumstances we will not disturb the jurors' weighing of aggravating and mitigating circumstances.

Our final statutory duty is to determine whether defendant's sentence is proportionate, considering defendant and his crimes. In making this determination, we consider "all cases which are roughly similar in facts to the instant case, although we are not constrained to cite each and every case we have used for comparison." *State v. McNeill*, 360 N.C. 231, 254, 624 S.E.2d 329, 344 (citing *State v. Al-Bayyinah*, 359 N.C. 741, 761, 616 S.E.2d 500, 514 (2005), *cert. denied*, 547 U.S. 1076 (2006)), *cert. denied*, —— U.S. ——, 127 S. Ct. 396, 166 L. Ed. 2d 281 (2006). "Although we 'compare this case with the cases in which we have found the death penalty to be proportionate. . . . we will not undertake to discuss or cite all of those cases each time we carry out that duty.' " *State v. Garcia*, 358 N.C. 382, 429, 597 S.E.2d 724, 756 (2004) (quoting *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254 (1994)), *cert. denied*, 543 U.S. 1156 (2005). "[O]nly in the most clear and extraordinary situations may we properly declare a sentence of death which has been recommended by the jury and ordered by the trial court to be disproportionate." *State v. Chandler*, 342 N.C. 742, 764, 467 S.E.2d 636, 648, *cert. denied*, 519 U.S. 875 (1996). The determination of proportionality of an individual defendant's sentence is ultimately dependent upon the sound judgment and experience of the members of this Court. *See McNeill*, 360 N.C. at 253, 624 S.E.2d at 344 (citing *State v. Garcia*, 358 N.C. at 426, 597 S.E.2d at 754).

There have been eight cases in which this Court has determined that a defendant's sentence was disproportionate. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

Defendant's case is unlike any case in which we have found a death sentence disproportionate. "[W]e have never found a death sentence disproportionate in a double-murder case." *State v. Sidden*, 347 N.C. 218, 235, 491 S.E.2d 225, 234 (1997) (citing *State v. Conner*, 345 N.C. 319, 338, 480 S.E.2d 626, 635, *cert. denied*, 522 U.S. 876 (1997)), *cert. denied*, 523 U.S. 1097 (1998). We decline to do so in this case. We also consider the brutality of defendant's murders in determining proportionality. *See Duke*, 360 N.C. at 144, 623 S.E.2d at 33 (citations omitted). The victims were two of the few people who ever showed any affection and concern for defendant, yet he brutally beat both of them with a wrench and then mercilessly fired bullets into their skulls for monetary gain. Defendant's sentence is not disproportionate.

## CONCLUSION

Defendant has assigned other instances of error, but has not provided any argument or supporting authority for these assignments in his brief. Those assignments of error are considered abandoned and are dismissed. *See* N.C. R. App. P. 28(b)(6); *McNeill*, 360 N.C. at 241, 624 S.E.2d at 336.

We conclude defendant received a fair trial and sentencing proceeding and we find no error in his convictions or his sentences. We additionally conclude that defendant's sentence of death is not disproportionate.

NO ERROR.